UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| WILLIAM HURT, DEADRA HURT, | ) | |
| ANDREA HURT, & DEBBIE HURT, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 3:14-cv-00092-JMS-MPB |
| | ) | |
| EVANSVILLE POLICE DEPARTMENT | ) | Hon. Jane Magnus-Stinson |
| DETECTIVES JEFF VANTLIN, JACK | ) | |
| SPENCER, WILLIAM ARBAUGH, and | ) | |
| JASON PAGETT, CITY OF EVANSVILLE, | ) | |
| KENTUCKY STATE POLICE OFFICERS | ) | |
| MATTHEW WISE and ZACHARY JONES, | ) | |
| and KENTUCKY MEDICAL EXAMINER | ) | |
| AMY BURROWS-BECKHAM, | ) | |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS
TO EXCLUDE THE TESTIMONY OF STEVEN DRIZIN**

Plaintiffs William Hurt, Deadra Hurt, Andrea Hurt, and Debbie Hurt, by and

through their attorneys, Loevy & Loevy, file this Response in Opposition to

Defendants' Motions to Exclude the Testimony of Steven Drizin. Plaintiffs state as

follows:

**INTRODUCTION**

The Kentucky State Police and the Evansville Defendants challenge the

expert opinions offered by Plaintiffs' false confessions expert, Professor Steven

Drizin. Professor Drizin is a leading expert on false confessions, with more than 15

years of experience in his field.  He has conducted primary research on false

confessions, published a consensus-based peer-reviewed article endorsed by the

1

American Psychological Association, and had his work cited by the United States Supreme Court. The opinions he offers are based on the sound methodology which is recognized in his field. His testimony is precisely the sort of information that the Seventh Circuit has recognized will help a jury understand the phenomenon of false confessions. Professor Drizin should be permitted to offer his opinions at trial.

### Summary of Professor Drizin's Opinions[1]

In order to properly address Defendants' arguments regarding citations to Professor Drizin's report, it is important to understand the opinions Professor Drizin offers in this case. Professor Drizin studies the existence of false confessions, their causes and consequences, and how to prevent interrogation-induced false confessions.  [Filing No. 261-19 at 2]. Professor Drizin studies data from proven false confession cases – cases where a person confesses and it is later learned definitively that the confession was false because: it turns out the crime never occurred; the confession proves to be physically impossible; the true perpetrator is identified; or scientific evidence disproves the confession. [Filing No. 279-1 at 27-28 (Drizin Dep. at 277:13-278:24)]. This is a very conservative definition of "false confessions," used in order to obtain a data set made up only of confessions that are virtually incontrovertibly false confessions.  [*Id.* at 27 (Drizin Dep. at p. 277, lines 19-24).]

---

[1] Because Defendants have raised similar arguments at Summary Judgment and in their *Daubert* motions, Plaintiffs' summary of Professor Drizin's opinions and certain substantive arguments in this filing necessarily overlap with the content of Plaintiffs' Sur-Reply in Opposition to Defendants' Motion for Summary Judgment. [Filing No. 280].

Professor Drizin has amassed the largest database of proven false confessions in the country. [Filing No. 261-19 at 2]. Based on that data, he has identified police tactics which can lead to false confessions, including coercive interrogation techniques and police contamination of the confession. [Filing No. 261-19 at 8-16]. Professor Drizin then applies his extensive knowledge of the tactics and indicia of unreliability present in proven false confession cases to evaluate the tactics and indicia of unreliability in specific cases where the confession has not been proven conclusively false (based on the conservative criteria outlined above). [Filing No. 279-1 at 19-20 (Drizin Dep. at 150:21-151:21)]; [Filing No. 261-19]. By reviewing the police tactics, traits of the suspect, and degree of contamination in the interrogation, Professor Drizin forms an opinion about the reliability of a confession. [Filing No. 279-1 at 19-20 (Drizin Dep. at 150:21-151:21)]; [Filing No. 261-19]. To be clear, Professor Drizin does not opine on whether confessions (including Plaintiffs' confessions) are true or false, but rather analyzes whether coercion was used to extract the confessions and whether the confession contains indicia of unreliability which are hallmarks of false confessions. [Filing No. 279-1 at 27-28 (Drizin Dep. at pgs. 277-78)]; [Filing No. 261-19]. Thus, in this case, consistent with his methodology, Professor Drizin does not opine on whether or not Plaintiffs' confessions were false. Rather, he opines that: i) false confessions can occur; ii) certain coercive police tactics lead to false confessions and those tactics were used against Plaintiffs during their interrogations; and iii) false confessions generally

bear certain indicia of unreliability and those indicia of unreliability are present in Plaintiffs' confessions. [Filing No. 261-19].

## Legal Standard

Federal Rule of Evidence 702 now incorporates *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and cases applying *Daubert*—like *Kumho Tire Co. v. Carmichael*, 525 U.S. 137 (1999). FED. R. EVID. (FRE) 702 (Advisory Note, 2000 amends.). Rule 702 provides that "a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." FRE 702.

Under Rule 702, "the rejection of expert testimony is the exception rather than the rule," FRE 702 (Advisory Note, 2000 amends.), and the Rule's inquiry is a "flexible one" focusing on an expert's principles and methodology, not her conclusions. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 594-95 (1993). Factual questions about an expert's opinions are for the jury because they go to weight of testimony—the credibility of the expert—not admissibility. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718-19 (7th Cir. 2000). Thus, rather than exclusion, "[v]igorous cross- examination, presentation of contrary evidence, and careful

instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 595.

Although Daubert identifies factors the court may consider when determining whether an expert's testimony is reliable—whether the expert's technique has been tested, subjected to peer review and publication, analyzed for known or potential error rate, or is generally accepted—the "list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho*, 526 U.S. at 141. The court enjoys broad discretion in evaluating reliability. *Id.* at 142. The admissibility inquiry "must be 'tied to the facts' of a particular case." *Id.* at 150 (quoting *Daubert*, 509 U.S. at 591). The reliability inquiry should "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152. "A Daubert inquiry is not designed to have the district judge take the place of the jury to decide ultimate issues of credibility and accuracy.*" Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012).

## ARGUMENT

## I.   **Professor Drizin Is Qualified to Testify As An Expert In False Confessions.**

Professor Drizin has been a leader in the field of false confessions research for over 15 years. [Filing No. 261-19 at 3]. He has been particularly dedicated to the study of false confessions among youth. [Filing No. 284-1 at 1-12]. Professor Drizin has amassed the largest database of proven false confessions in the country. [Filing

No. 284-2 at 2]. He is co-author of *The Problem of Police-Induced False Confessions in the Post DNA Age*, which is a qualitative and quantitative analysis of 125 proven false confessions, which was cited by United States Supreme Court in *J.D.B. v. North Carolina*, (June 16, 2011) and in *Corley v. United States*, 129 S.Ct. 1558 (2009). He is currently working on a sequel to that article which analyzes an additional 200 proven false confessions. [*Id*.]. Professor Drizin is co-author of *Police-Induced Confessions: Risk Factors and Recommendations*, a consensus-based, peer-reviewed survey of the most significant research on false confessions, which has been adopted by the American Psychological Association. [Filing No. 284-1 at 3].

He has published two books and four additional book chapters related to false confessions, and over a dozen academic articles on false confessions and interrogation techniques. [*Id*. at 2-4]. He has lectured nationwide on more than 80 occasions at conferences and academic institutions, including the American Judges Association, the National Forensic College, the National Judicial Institute, the MacArthur Foundation Research Network on Adolescent Development & Juvenile Justice Network Conference, the Juvenile and Forensic Science Conference, the Wisconsin Justice Study Commission, the American Society of Criminology Annual Conference, and the American Academy of Child and Adolescent Psychology. *Id*. at 6-12. He has served as a consultant or expert witness in more than 20 cases and has been retained by both prosecutors and criminal defense attorneys. [*Id*. at 13-14]. Professor Drizin has been qualified as an expert in false confessions in

6

Indiana, North Carolina, Ohio, Texas, Washington, and Washington, D.C. [Filing No. 251-19 at 3].

Professor Drizin has advised law enforcement on the dangers of false confessions in youth, including a lecture at the national conference of the International Association of Chiefs of Police ("IACP"). [Filing No. 284-1 at 3]. He has also collaborated with the IACP and the U.S. Department of Justice's Office of Juvenile Justice and Delinquency Prevention to create the training manual *Reducing Risks: An Executive's Guide to Effective Juvenile Interview and Interrogation* which has been distributed widely to police departments around  the  United  States. [*Id.*]. He is also a member of the IACP's  Advanced Juvenile Interview and Interrogation Advisory Working Group. [Filing No. 261-19 at 3].

An expert may be qualified by his academic study, training, and practical experience. *Kumho Tire Co.*, 526 U.S. at 156 ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."). When determining whether an expert is qualified, the court should consider his "full range of practical experience as well as academic or technical training...." *Trs. Of Chi. Painters & Decorators Pension v. Royal Intl Drywall & Decorating, Inc.*, 493 F.3d 782, 788 (7th Cir. 2007) (*quoting Smith,* 215 F.3d at 718); *Bryant v. City of Chicago*, 200 F.3d 1092, 1098 (7th Cir. 2000) (same).

Professor Drizin's combination of primary social science research in the field of false confessions and his analysis of juvenile confessions in individual cases more

than qualifies him to provide expert testimony on false confessions. Defendants note that Professor Drizin does not hold academic credentials in psychology or sociology [Filing No. 285 at 9]; [Filing No. 287 at 28], but they do not explain how that fact renders him unqualified to do the research he has successfully conducted—with accolades far and wide up to and including citation by the United States Supreme Court—for over 15 years. [Filing No. 284-1 at 1-12]. For good reason; there is no authority for the proposition that an expert in the area of false confessions must receive a specific academic degree. Professor Drizin has co-authored the major peer-reviewed articles on false confessions, based on his own primary research, and taught widely. He is qualified to opine on that research.

Despite Professor Drizin's impressive primary research, extensive publications, and advice and consultation with leaders in law enforcement such as the International Association of Chiefs of Police, Defendants complain that Drizin is not qualified to "criticize police practices" because he is not a police officer and has not conducted a police interrogation himself. [Filing No. 285 at 8, 9, 10]. To be clear, Plaintiffs do not offer Professor Drizin as a police practices expert, but as a false confessions expert. Courts in the Seventh Circuit routinely allow expert testimony on false confessions by experts with expertise in the empirical study of false confessions, not police officers. *Caine v. Burge,* Case No. 11-CV-8996, 2013 WL 1966381 at *2 (N.D. Ill. May 10, 2013); *Scott v. City of Chicago*, No. 07-CV-3684, 2010 WL 3034254, at *6 (N.D. Ill. Aug. 3, 2010); *Kluppelberg v. Burge,* No. 13-C-3963, 2016 WL 6821138 at *5 (N.D. Ill. Sept. 16, 2016). Defendants do not cite any

authority for the proposition that a false confessions expert must be a police officer because there is none.  The empirical study of false confessions and the practical experience in police work are distinct though related areas of expertise. There is no requirement that an expert in one field must be an expert in the other.

Defendants also seek to compare Professor Drizin to the expert offered in *United States v. Jacques*. [Filing No. 285 at 10] *citing* 784 F.Supp.2d 59, 62 (D. Mass. 2011). But this comparison falls flat. The expert in *Jacques* had conducted no primary research in the area of false confessions, had not published a single article related to the central issues in the case, did not critique a particular law enforcement technique in the case, or explain how a particular interrogation method could have had an impact on the confession. *Id.* at 62, 64.  By contrast, Professor Drizin is one of the preeminent researchers in the area of juvenile false confessions, has published extensively, and has critiqued the law enforcement techniques used in this case and how it impacted the confessions in a well-supported 40 page report. *See,* [Filing No. 284-2 including, *e.g.* at 17-33 discussing William Hurt's interrogation, at 34-36 discussing Deadra Hurt's interrogation, at 36-39 discussing Andrea Hurt's interrogation].  Unlike the expert in *Jacques,* Professor Drizin does much more than simply explain that false confessions occur, he explains how the complex dynamic of misclassification, coercion, and contamination work together to create a seemingly detailed, but actually false, confession. [*Id.* at 8-10, 13-33].

Professor Drizin is a renowned scholar in the field of false confessions and is more than qualified to testify about his work.

## II. Professor Drizin's Testimony on False Confessions Will Assist the Jury.

### A. The Supreme Court of the United States, the Seventh Circuit, and District Courts within the Seventh Circuit Recognize the Utility of False Confessions Research.

Defendants argue that Professor Drizin's testimony regarding the phenomenon of false confessions will not assist the jury because the concept of false confessions is within lay knowledge. [Filing No. 285 at 12-14]; [Filing No. 287 at 22]. But the Supreme Court and the Seventh Circuit acknowledge the utility of false confessions research and empirical study indicates that lay people do not understand the phenomenon. To be clear, Professor Drizin explains not just that false confessions exist, but also how they come about: how age and innocence can be risk factors, how interrogators misclassify suspects, use specific coercive tactics, and contaminate confessions by feeding facts. [Filing No. 284-2 at 8-16].  He also explains how to identify an unreliable confession by testing its contents against non-public facts of the crime. [*Id.* at 16-17]. This analysis of confessions is beyond the ken of lay jurors.

The Supreme Court has acknowledged the existence of false confessions and the utility of false confession research. *Corley v. United States,* 556 U.S. 303, 321 (2014) ("there is mounting empirical evidence that these pressures can induce a frighteningly high percentage of people to confess to crimes they never committed") *citing* Drizin & Leo, The Problem of False Confessions in the Post–DNA World, 82

N.C.L.Rev. 891, 906–907 (2004); *J.D.B. v. North Carolina*, 564 U.S. 261, 269 (2011).

(the risk of false confessions "is all the more troubling—and recent studies suggest,

all the more acute—when the subject of custodial interrogation is a juvenile.").

The Seventh Circuit has long held that expert testimony on the phenomenon

of false confessions can assist the jury. *United States v. Hall,* 93 F.3d 1337, 1345

(7th Cir. 1996). In fact, it is considered particularly useful because it explains a

phenomenon that is counter-intuitive for lay jurors: innocent people may confess to

heinous crimes. As the Court noted in *Hall*,

> Properly conducted social science research  often shows that commonly held
> beliefs are in error. [Expert testimony on false confessions]. . . would have
> let the jury know that a phenomenon known as false confessions exists, how
> to recognize it, and how to decide whether it fit the facts of the case being
> tried.

93 F.3d at 1345. Empirical research indicates that lay jurors do not adequately

appreciate the concept of false confessions. [Filing No. 284-2 at 16]; [Filing No. 307-

2 at 387-88, 395, 397].

Because expert testimony on false confessions is useful to the jury and

sanctioned by the Seventh Circuit, district courts routinely admit such testimony in

civil rights cases. *See, e.g., Caine*, 2013 WL 1966381 at *2 ("Although jurors'

common sense may suggest to them that someone would never falsely confess to

committing murder, Dr. Leo's testimony will educate jurors

that false confessions sometimes *do* occur. As a result, the Court believes it will be

helpful for the jury to hear expert testimony on this issue."); *Scott*, 2010 WL

3034254, at *6 ("As for defendants' objections that 'portions of [the false confession

expert's] proffered testimony are obvious to lay jurors,' their view is unduly restrictive.") (internal citation omitted); *Kluppelberg v. Burge,* No. 13-C-3963, 2016 WL 6821138 at *5 (N.D. Ill. Sept. 16, 2016).

Here, expert testimony on false confessions is particularly useful to explain how three young people with no experience with law enforcement, no criminal background, and no connection to the alleged crime besides a family relationship, provided false confessions. In particular, an explanation of how coercion and contamination tactics can work hand-in-hand to create a seemingly detailed, yet totally uncorroborated, confession will be useful to the jury. Most jurors have no experience with interrogations and would not be able to identify coercion and contamination tactics without assistance. And many potential jurors fail to recognize that confessions can be coerced without physical force. [Filing No. 307-2 at 387-88, 395, 397].

## B. Defendants' Cited Cases Do Not Compel A Different Result.

The Defendants cite a number of out-of-circuit criminal cases where expert testimony on false confessions has been excluded, but none of these cases actually undermine the Seventh Circuit's reasoning in *Hall. Hall*, at 1345 (expert testimony "let the jury know that a phenomenon known as false confessions exists, how to recognize it, and how to decide whether it fit the facts of the case being tried). [Filing No. 285 at, e.g., 22-23]; [Filing No. 287 at 22].

Several of the cases cited by Defendants are inapposite as they concern instances where there is no allegation of a coerced confession or a custodial

12

interrogation.  *See, e.g.*, *United States v. Deuman*, 892 F.Supp. 2d 881 (W.D. Mich. 2012) (no custodial interrogation occurred); *Com v. Alicia*, 92 A.3d 753, 756 (Pa. 2014) (no allegation of coerced confession); *State v. Rafay,* 168 Wash. App. 734 (Wash. Ct. App. 2012) (no custodial interrogation occurred); *United States v. Mamah*, 332 F.3d 475 (7th Cir. 2003) (allegations concerned whether a previous coerced confession could impact a second confession—a subject on which false confessions experts do not opine). Many of the cited cases are appellate decisions which evaluate the exclusion of the expert testimony under the lax "abuse of discretion" standard. *See, e.g. State v. Wooden,* No. 23992, 2008 WL 2814346 (Ohio Ct. App. 2008); *U.S. v. Benally*, 541 F.3d 990 (10th Cir. 2008). And the trial courts in these cases embrace some of the same strawman arguments Defendants advance here. *See e.g., Vent .v State,* 67 P.3d 661, 670 (App. Alaska 2003) (citing lack of "error rate" for qualitative research) (see section IV B *infra* for a discussion of the fallacious "error rate" argument).

The Seventh Circuit's precedent in *Hall* offers ample guidance to this Court and it should not be disregarded in favor of out-of-circuit or state law cases.

### C. The Recording of the Interrogations Does Not Impact the Utility of Expert Testimony on False Confessions.

Defendants argue that the jury can simply watch the videotaped confessions and therefore Professor Drizin's testimony will not assist them.  [Filing No. 285 at 13]; [Filing No. 287 at 24]. This deceptively simple argument is fundamentally flawed. The utility of expert testimony on false confessions is not any different when confessions are video-taped. Professor Drizin is not being offered to tell the

jury what happened during the interrogations; rather, he will analyze what the jury sees in the videos and break down the various tactics and phases of the interrogations to explain why the confessions are not reliable. The videos themselves do not explain the concepts of misclassification, coercion, and contamination or demonstrate how Defendants were able to commit these errors and produce false confessions. Professor Drizin will help the jury parse what they see in the videos, not serve as a substitute for the videos. His testimony should be admitted.

Professor Drizin's testimony will assist the jury and should be admitted.

## III.    Professor Drizin's Methodology Is Reliable.

Defendants raise a number of objections to Professor Drizin's methodology, but he employs the same methodology as all of the experts in his field, and opinions based on this methodology have been repeatedly admitted in the Seventh Circuit. Defendants misapprehend Drizin's methodology, and advance strawman arguments that relate—at most—to the weight, not admissibility, of Professor Drizin's testimony.

In *Daubert*, the Supreme Court provided four illustrations of factors a Court may, but is not required to, consider when assessing the reliability of an expert's methodology, including (1) whether the theory is based on scientific or other specialized knowledge that has been or can be tested; (2) whether the theory has been subjected to peer review; (3) the known or potential rate of error and the existence of standards controlling the theory's operation; and (4) the extent to which

the theory is generally accepted in the relevant community. *Daubert,* 509 U.S. at

593-94; *see also*, *Kumho Tire Co.,* 526 U.S. at 151.  Those factors are not a

"definitive checklist or test" and were meant to be "helpful, not definitive."  *Daubert*,

509 U.S at 593; *Kumho* at 151.  Rather,

> "a trial court *may* consider one or more of the more specific factors that
> *Daubert* mentioned when doing so will help determine that testimony's
> reliability. But, as the Court stated in *Daubert,* the test of reliability is
> "flexible," and *Daubert's* list of specific factors neither necessarily nor
> exclusively applies to all experts or in every case. Rather, the law grants a
> district court the same broad latitude when it decides *how* to determine
> reliability as it enjoys in respect to its ultimate reliability determination."

*Kumho Tire Co.*, 526 U.S. at 141-142.  Thus, the *Daubert* analysis is flexible and its

overarching purpose is "to make certain that an expert, whether basing testimony

upon professional studies or personal experience, employs in the courtroom the

same level of intellectual rigor that characterizes the practice of an expert in the

relevant field." *Id.* at 150, 152.

### A. Professor Drizin's Methodology Satisfies *Daubert*.

Professor Drizin's area of expertise and his methodology ably meet the

*Daubert* standard.  For the past thirty years, scholars investigating the

phenomenon of false confessions have drawn from "overwhelming empirical

evidence" showing that false confessions do occur and attempting to explain why.

[Filing No. 261-19 at 7].  Professor Drizin's research relies on the "most significant

studies and findings in the area of police interrogations and false confessions."

[Filing No. 261-19 at 2-3]. This study has resulted in "extensive, peer-reviewed"

literature. [*Id.*]. Courts in the Seventh Circuit have concluded "that the field of

police interrogation practices, psychological coercion, and false confessions is sufficiently developed in its methods to constitute a reliable body of specialized knowledge under Rule 702." *Caine,* 2013 WL 1966381, at *3. Professor Drizin's methodology has been approved by courts in the Seventh Circuit. *See also, Scott,* 2010 WL 3035254, at *5-6 (finding the methodology reliable); *United States v. Hall,* 974 F. Supp. 1198, 1205 (C.D. Ill. 1997) (finding the methodology reliable); *Kluppelberg,* 2016 WL 6821138 at *4.

Professor Drizin's testimony is based on sufficient data and reliable methods, including "[e]ither 'hands-on testing' or 'review of experimental, statistical, or other scientific data generated by others in the field,'" which is "a reasonable methodology upon which to base an opinion." *Clark v. Takata Corp.*, 192 F.3d 750, 758 (7th Cir. 1999) (quoting *Cummins v. Lyle Inds.*, 93 F.3d 362, 369 (7th Cir. 1996)). Professor Drizin's research has also been subject to peer-review and he has acted as a peer-reviewer for the work of colleagues in his field. [Filing No. 251-19 at 2].

As described above, Professor Drizin's methodology is based on his extensive knowledge of proven false confessions and police interrogation tactics.  He applies this knowledge to specific confessions that have not yet been proven false, and identifies coercive tactics, police contamination, and indicia of unreliability (such as whether the suspect's narrative fits the verifiable facts of a given crime). [Filing No. 261-19 at 17-40]. Thus, Professor Drizin's scientifically accepted, specialized knowledge, aides the jury in evaluating a confession, while leaving the ultimate factual determination to the trier of fact.

**B.  Professor Drizin's Methodology Is Widely Accepted in His Field.**

Defendants argue briefly that Drizin's methodology is not generally accepted in the "larger, relevant scientific community," [Filing No. 287 at 27] apparently referring to the scientific community that does not study false confessions[2]. This argument makes no sense. Among experts who study false confessions, Professor Drizin's methodology is the accepted approach. *See, e.g., Hall*, 974 F. Supp. at 1204-1205 (C.D. Ill. 1997) (describing the methodology used by Drizin here and the others in his scientific community). Defendants do not explain what other methodology would be more widely accepted because no such methodology exists. Because Drizin's approach enjoys the "general acceptance in the relevant scientific community," his opinion is reliable. *Srail v. Village of Lisle,* 249 F.R.D. 544, 563 (N.D. Ill.2008). Professor Drizin uses the accepted approach in his field and there is, of course, no requirement that scientists outside of his field have any comment on his methodology.

**C.  Professor Drizin's Methodology Does Not Rest On Assumptions That A Confession Is False.**

---

[2] Defendants also attempt to subdivide the study of false confessions into two subspecialties—proven and unproven false confessions—in an attempt to undermine Professor Drizin's methodology. [Filing No. 287 at 27]. This argument is disingenuous at best. No authority in the field of false confessions makes this categorical distinction. Rather, these two terms are used to create a conservative and reliable methodology for evaluating confessions. As described above, experts in the field analyze "proven false confessions" in order to study the interrogation tactics used. They then evaluate confessions that are not yet proven false to analyze the interrogation tactics used and compare the facts of the confession to non-public facts. The distinction between proven and unproven false confessions is used only to distinguish a confession's use and placement within the methodology. It is not a distinction between subspecialties within the field. Accordingly, no court in the Seventh Circuit has made a distinction between experts in "proven false confessions" versus experts in false confessions. This Court should also reject this false dichotomy.

Defendants assert that Professor Drizin "assumes" certain interrogation tactics yield false confessions or "begins with the premise" that certain confessions were false. [Filing No. 285 at 11, 25]; [Filing No. 287 at 2] ("his methodology begins with the premise that the confessions were false or coerced"). Quite the opposite. Drizin uses proven—not assumed—false confessions as a baseline, conservative data-set from which to conduct his research. [Filing No. 284-2 at 2, 16]. Of course, the KSP Defendants' citation to Drizin's deposition— [Filing 284-4 (Drizin Dep. at p. 111, lines 5-24; p. 112, lines 1-24)]—does not state that Professor Drizin assumes anything about whether a confession is false. And for their part, the EPD Defendants offer no citation in support of their statement. Defendants repeatedly misrepresent the methodology that Professor Drizin and his colleagues use in the hope that mere repetition will overbear facts.

With apologies to the Court for repeating this information once again: Professor Drizin does not assume any confession is false or assume that particular tactics yield false confessions. To the contrary, Professor Drizin has created a data set of nearly incontrovertible proven (proven—not assumed) false confessions. He then identifies tactics used in those confessions—in combination with contamination—to create false confessions. [Filing No. 284-2 at 2]; [Filing No. 279-1 at 27-28 (Drizin Dep. at 277:13-278:24)]; [Filing No. 307-1 at 5, 10 (Drizin Dep. at p. 154, lines 8-14, p. 159, lines 13-22)]. He uses that research to analyze confessions that have not yet been proven false to assess their reliability, considering all three errors that create false confessions: misclassification, coercion, and contamination.

18

[Filing No. 279-1 at 19-20 (Drizin Dep. at 150:21-141:21]; [Filing No. 261-19]. When he analyzes the confessions which are not yet proven false, he does not assume they are true or false. He simply assesses their reliability. While Drizin tries to scrupulously rely on a conservative data-set, Defendants repeat—without any basis whatsoever—that he is making assumptions. This approach rings hollow once again and the Court should reject it.

### D. Professor Drizin's Testimony is Not Excludable Simply Because Coercive Tactics Sometimes Yield Truthful Confessions.

Defendants attempt to slice Professor Drizin's methodology in yet another inappropriate way: they criticize the fact that he cannot look at interrogation tactics in isolation and predict whether a false confession will occur. [Filing No. 285 at 17]; [Filing No. 287 at 2, 13, 24]. But, of course, this "criticism" is simply restating a truism: coercion can yield true or false information. Professor Drizin's methodology, and that of the other scholars in his field, takes into account whether coercive tactics were used, but his methodology does not stop there. The subsequent step of the methodology consists of comparing the facts obtained using coercive tactics to the non-public facts to determine how well the confession "fits" the crime. [Filing No. 284-2 at 16-17]. By analyzing both the use of coercive tactics along with the "fit" of the confession with the non-public facts, Drizin is then able to provide valuable information about the reliability of confessions. *Id.*

Defendants are apparently dissatisfied that Drizin uses two steps to come to his conclusion on reliability, instead of being able to simply look at a coercive tactic and guarantee it will yield a false confession. [Filing No. 287 at 24]. But how could

Drizin say, for example, that every time a threat of physical injury is made the result will be a false confession? Sometimes law enforcement will make a threat of physical injury to a guilty party and obtain a truthful confession. This is not a failing of Professor Drizin's methodology; it is simply a reality in policing.

The fact that Professor Drizin's methodology cannot predict false confession, and instead only explains indicia of unreliability, is not a failing of his methodology and is, at most, a subject for cross-examination. *Cyrus v. Town of Mukwonego*, 624 F.3d 856, n.8 (7th Cir. 2010) (an "expert's inability to isolate one specific factor when multiple factors cause an injury implicates the weight of the expert's testimony, not its admissibility.")

Professor Drizin's methodology is not undermined by the fact that coercive tactics can sometimes yield truthful confessions or that he does not have the divine omniscience necessary to predict false confessions.

### E. Professor Drizin's Methodology Is Not Flawed Simply Because He Did Not Meet Plaintiffs.

Professor Drizin listened to the audio interviews of Plaintiffs, watched their videotaped confessions, and read their deposition transcripts. [Filing No. 284-2 at 3-4]. Yet Defendants criticize his methodology because he did not meet with Plaintiffs personally. [Filing No. 285 at 25]; [Filing No. 287 at 28]. Defendants cite no authority in the field of false confessions which requires an expert to meet the interrogated person in order to render an opinion on the videotaped confession. Besides, this argument goes to weight, not admissibility, and Defendants may cross-examine on this topic if they wish. *Walker v. Soo Line R. Co*, 208 F.3d 581, 591 (7th

Cir. 2000) (physician is permitted to render expert opinion even though he did not personally examine the subject); *Nanda v. Ford Motor Co.,* 509 F.2d 213, 221 (7th Cir. 1974) (that expert had not personally examined malfunctioning tire went to weight, not admissibility, of his testimony). Professor Drizin did not need to meet Plaintiffs to render his opinion on their interrogations and his opinions cannot be excluded on that basis.

## IV.   Defendants' Remaining Criticisms of Professor Drizin's Methodology Constitute Tired Straw-Man Arguments Which Do Not Bear On Admissibility.

Defendants re-raise certain strawman arguments that they first raised at summary judgment.  [Filing No. 278].   However, Defendants do not explain how a frequency rate is relevant to this case (if it were even ascertainable, which it is not) or why qualitative research should be susceptible to a quantitative "error rate." These objections fail and the Court should admit Professor Drizin's testimony.

### A. The "Frequency Rate" of False Confessions Has No Bearing on This Case, and Is Not a Basis on Which to Exclude Professor Drizin's Testimony.

Defendants trot out the tired argument that because there is no known rate of false confessions, Professor Drizin's testimony about the confessions in this case is somehow inadmissible. [Filing No. 285 at 17]; [Filing No. 287 at 13, 24]. But since all parties agree that false confessions do occur, the frequency rate of false confessions overall has no bearing on this case. Simply put, false confessions could be exceedingly rare, and the confessions in this case could nonetheless constitute those rare instances.

Defendants do not explain why the frequency rate would be relevant to this case. *Allstate Ins. Co. v. Maytag Corp.*, No.98-CV-1462, 1999 WL 203349, at *4 (N.D. Ill. Mar. 30, 1999) ("Moreover, a party who seeks to exclude expert testimony on the ground of failure to conduct testing has the burden of explaining what tests should have been run, and what would have been accomplished by that testing."); *DePaepe v. General Motors Corp*, 141 F.3d 715, 720 (7th Cir. 1998) ("A litigant that wants a court of appeals to set aside a district judge's decision to admit expert testimony has to do more than appeal to a lawyer's sense of how science should be done. "). The fact that Professor Drizin has not determined a universal rate of false confession does not suggest that his research about why innocent people falsely confess is in any way flawed. *Kluppelberg,* 2016 WL 6821138 at *4 (where expert was offered to explain that certain police interrogation tactics are coercive and can result in false confessions, the lack of a frequency rate for false confessions showed the limits of the expert's methodology, not its unreliability). Furthermore, the lack of such a frequency rate cannot signify a failure in Professor Drizin's methodology since the leading paper on false confessions—the American Psychology Association (APA) White Paper—acknowledges in a "consensus-based statement on confessions," that "an incidence rate [of false confessions] cannot be determined." [Filing No. 279-2 at 3, 4-5].

It would be improper for the Court to demand a frequency rate of false confessions in order for an expert's testimony to be admissible when the scientific field at issue has stated that no such rate can be determined. *See*

*DePaepe v. General Motors Corp.*, 141 F.3d 715, 719-20 (7th Cir. 1998) (rejecting a challenge to an expert's methodology and explaining that requiring "judges to make a priori judgments about how scientific inquiry should be conducted" leads to "quackery"); *Kluppelberg*, 2016 WL 6821138, at *4 (where field of study cannot determine the answer to a specific question it does not render the methodology for the overarching field unreliable). Moreover, the dearth of conclusive information on this question makes sense: as Professor Drizin explained at his deposition, any determination would be reliant on police departments tracking and recording confessions, but this is not data that is collected or maintained. [Filing No. 279-1 at 29 (Drizin Dep. at p. 279, lines 1-22).].

Since a universal false confession rate has no bearing on whether Plaintiffs' confessions were false, and the data sufficient to establish a false confession rate is simply unavailable, the Court should reject Defendants' argument.

## B. The Concept of an "Error Rate" Is a Red Herring Because False Confession Studies Are Based in Qualitative Research.

Defendants' argument that Professor Drizin's testimony should be excluded because his methodology has "no known rate of error" is unsupported by the law. [Filing No. 285 at 20]; [Filing No. 287 at 24]. Although the court in *Daubert* did mention the concept of an "error rate" as one factor a court may consider in determining reliability, the *Daubert* illustrative factors "do not all necessarily apply even in every instance in which the reliability of scientific testimony is

challenged." *Kumho Tire,* 526 U.S. at 151. Accordingly, the trial court has "broad latitude" to determine whether "whether *Daubert's* specific factors are, or are not, reasonable measures of reliability in a particular case." *Kumho Tire*, 526 U.S. at 152; *See also Lees v. Carthage College*, 714 F.3d 516, 524 (7th Cir. 2013) (the law requires only that the methodology "fit[] the factual and legal context" of the case at hand.)

The concept of an "error rate" makes no sense in the context of qualitative research. Simply put, there is no way to know to a quantifiable certainty whether Professor Drizin's explanations for false confessions are in error and how often because his inquiry is directed towards questions calling for descriptions: why do people confess falsely? what police interrogation tactics lead to false confessions? how can one determine that a confession is false? To answer those questions, Professor Drizin has examined incontrovertible instances of proven false confessions, reviewed the police tactics used in those cases, and reviewed the confessions themselves for indicia of reliability. Another researcher could examine that same set of false confessions and disagree with Professor Drizin's explanation, but that would not mean that Professor Drizin made an error. It would also not mean that Professor Drizin's critic made an error. There is no way to have a "rate of error" in a field of qualitative research. Instead, research in the social sciences is evaluated and critiqued through rigorous peer review. Professor Drizin has published numerous peer-reviewed articles on the subject of false confessions and

has acted as a peer-reviewer. [Filing No. 261-19 at 2][3]. The law does not require that Professor Drizin provide an error rate for his methodology in order for his testimony to be admissible. For that reason, courts in the Seventh Circuit do not require an "error rate" for the methodology used by false confession experts and this Court should not do so either. *Hall*, 93 F.3d 1337; *Caine*, 2013 WL 1966381; *Kluppelberg*, 2016 WL 6821138

### V. Professor Drizin Is Not Required to Opine on Whether Plaintiffs' Confessions Were False.

Defendants complain that Professor Drizin does not opine on whether or not the confessions in this case were proven false confessions. [Filing No. 285 at 18]; [Filing No. 287 at 21]. The concept of "proven false confessions" is highly circumscribed within Drizin's field—it refers to instances where: it turns out the crime never occurred; the confession proves to be physically impossible; the true perpetrator is identified; or scientific evidence disproves the confession. [Filing No. 279-1 at 27-28 (Drizin Dep. at 277:13-278:24)]. Those features are not present here and Professor Drizin therefore opines only that the confessions lack reliability, not that they are proven false.

There is no requirement that an expert's testimony reach the "ultimate issue"—such as whether the confessions were true or false—in order to be admissible. *Newsome v. McCabe*, 319 F.3d 301, 306 (7th Cir. 2003) ("testimony need not prove everything in order to be useful."); *see also Smith,* 215 F.3d at 718 ("The

---

[3] Defendants stretch the concept of "peer-review" and criticize the fact that Drizin's opinions *in this case* have not been peer-reviewed. [Filing No. 285 at 29]. This curious criticism has no basis in the law.

25

expert need not have an opinion on the ultimate question to be resolved by the trier of fact in order in order to" assist the trier of fact.). In fact, if Professor Drizin did somehow try to opine on the truth or falsity of the confessions in this case, the Defendants would no doubt argue he had impermissibly invaded the province of the jury.

Professor Drizin's conclusions that the confessions in this case were unreliable is admissible and he is not required to opine on their truth or falsity.

## VI.   There Is No Substitute For Drizin's Testimony and Even If There Were, A Proxy Has No Bearing on the Admissibility of Drizin's Testimony.

Defendants suggest that a jury instruction on the subject of false confessions could serve as a substitute for Drizin's testimony [Filing No. 287 at 24] or that Plaintiffs' police practices expert Denny Waller's testimony could substitute for Professor Drizin's testimony. [Filing No. 285 at 14]. But a jury instruction can only tell the jurors that sometimes false confessions occur. It cannot explain the complex social dynamics at play during the custodial interrogation of a young person, discuss coercive tactics, elaborate on the subtle ways interrogators feed facts and contaminate confessions, or compare a confession to non-public facts as Drizin can. Drizin's testimony is admissible and the possibility of an ineffectual jury instruction cannot stand in its way. And because Drizin's testimony is admissible, and deals with subject matter that is separate, though related to police practices (see section I *supra*), it may not be eliminated as cumulative. The existence of two experts opining on distinct areas of expertise does not bear on the admissibility of

either one. There is no substitute for the assistance Drizin will offer the jury and his testimony should be admitted.

## VII. Cross-Examination of Drizin Is Sufficient to Address Defendants' Concerns

Defendants have not raised a single issue that renders Drizin's testimony inadmissible. All of Defendants' arguments go to the weight of Professor Drizin's testimony and can be addressed through cross-examination, not exclusion. FED. R. EVID. 702 (2000 Amends.) ("the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system."); *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 766 (7th Cir. 2013) ("An expert may provide expert testimony based on a valid and properly applied methodology and still offer a conclusion that is subject to doubt. It is the role of the jury to weigh these sources of doubt); *Caine* at *2 (alleged shortcomings in false confession expert's data collection could be challenged through vigorous cross-examination).

### CONCLUSION

Professor Drizin is a leader in the field of false confessions, his methodology is sound, and his testimony will assist the jury. This Court should allow him to testify.

RESPECTFULLY SUBMITTED,

/s/ Theresa Kleinhaus
*Attorney for the Plaintiffs*

Arthur Loevy
Jon Loevy
Tara Thompson
Theresa Kleinhaus
Loevy & Loevy

27

311 N. Aberdeen, Third Floor
Chicago, Illinois 60607
(312) 243-5900

## **CERTIFICATE OF SERVICE**

      I, Theresa Kleinhaus, an attorney, hereby certify that on February 16, 2017, I caused the foregoing **Plaintiffs' Response In Opposition To Defendants' Motions To Exclude the Testimony of Steven Drizin** to be filed via CM/ECF, which effected service upon all counsel of record.

<u>/s/ Theresa Kleinhaus</u>

28