UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| WILLIAM HURT, | ) | |
| DEADRA HURT, | ) | |
| ANDREA HURT, | ) | |
| DEBBIE HURT, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | No. 3:14-cv-00092-JMS-MPB |
| | ) | |
| JEFF VANTLIN, | ) | |
| JACK SPENCER, | ) | |
| WILLIAM ARBAUGH, | ) | |
| JASON PAGETT, | ) | |
| LARRY NELSON, | ) | |
| CITY OF EVANSVILLE, | ) | |
| MATTHEW WISE, | ) | |
| ZACHARY JONES, | ) | |
| AMY BURROWS-BECKHAM, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

Presently pending before the Court in this case are three Motions for Summary Judgment—

one filed by Defendants City of Evansville (the "City") and Evansville Police Department

Detective Jeff Vantlin, Detective Jack Spencer, Detective William Arbaugh, Detective Jason

Pagett, and Sergeant Larry Nelson[1] (collectively, the "EPD Defendants"), [Filing No. 254]; one

filed by Kentucky State Police Detectives Zachary Jones and Matthew Wise (collectively, the

"KSP Defendants"), [Filing No. 256]; and one filed by Kentucky Medical Examiner Dr. Amy

Burrows-Beckham, [Filing No. 255]. Plaintiffs are pursuing various state and federal claims

---

[1] Sergeant Nelson died during the course of this litigation, [Filing No. 223], and Plaintiffs do not
dispute that he is entitled to summary judgment, [Filing No. 267 at 20]. Plaintiffs' Complaint
included claims against Sergeant Richard Blanton and Lieutenant Dan DeYoung, [Filing No. 1],
but those claims were dismissed at the pleadings stage, [Filing No. 112].

against each of the Defendants, alleging that they were wrongfully targeted, arrested, and prosecuted for the death of their uncle, Marcus Golike,[2] whose body was found in the Ohio River in June 2012.  Plaintiffs' theory of the case is that the Defendants erroneously focused on them as suspects in Marcus' death and then used unconstitutional tactics to try to build their case by coercing Plaintiffs' confessions and fabricating evidence.  For the reasons that follow, the Court grants in part and denies in part the pending motions.  To the extent the motions are denied, it is because there are genuine issues of material fact surrounding Marcus' death, the voluntariness of Plaintiffs' subsequent confessions, and the Defendants' intent that prevent summary judgment.  Put another way, because a reasonable jury could find in Plaintiffs' favor or in Defendants' favor on these genuinely disputed factual issues, summary judgment in Defendants' favor is inappropriate on many of Plaintiffs' claims.  The Court does find, however, that KSP Medical Examiner Dr. Burrows-Beckham is entitled to summary judgment as a matter of law.

# I.
## STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits.  Fed. R. Civ. P. 56(c)(1)(A).  A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1)(B).

---

[2] Mr. Golike's first name is spelled as both "Marcus" and "Markus" in various exhibits.  Because the parties primarily refer to him as "Marcus" in their briefs, the Court will do the same.

Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to

3

the summary judgment motion before them," *Johnson*, 325 F.3d at 898.  Any doubt as to the

existence of a genuine issue for trial is resolved against the moving party.  *Ponsetti v. GE Pension

Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

## II.
### BACKGROUND[3]

The following factual background is set forth pursuant to the standards detailed above.  The

facts stated are not necessarily objectively true, but as the summary judgment standard requires,

the undisputed facts and the disputed evidence are presented in the light most favorable to Plaintiffs

as the non-moving parties, drawing all reasonable inferences in their favor.  *See Reeves v.

Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).  That said, because the Court

ultimately finds that multiple genuine issues of material fact preclude summary judgment on many

of Plaintiffs' claims, the Court will not address every factual discrepancy between the parties.

Instead, the Court will set forth the overarching background of the case.

### A.  Marcus' Death

Marcus was a diagnosed schizophrenic who on multiple occasions had threatened to

commit suicide by jumping from a bridge in Evansville.  [Filing No. 262-1; Filing No. 261-8 to

Filing No. 261-15; Filing No. 262-3 at 2; Filing No. 259.]  He was released from prison on June

7, 2012, and listed the Rescue Mission in Evansville as his address.  [Filing No. 254-1 at 1.]

On June 17, 2012, three teenagers found a dead male—later identified as Marcus—in the

Ohio River.  [Filing No. 256-20 at 4; Filing No. 256-4 at 3-4.]  Marcus had an Indiana University

---

[3] The EPD Defendants argue that Plaintiffs did not comply with Local Rule 56-1, which requires a response brief to include a section labeled "Statement of Material Facts in Dispute," and, consequently, "the Court should find that the material facts set out in the [EPD Defendants' memorandum] are not in dispute."  [Filing No. 278 at 1.]  The Court finds this argument specious, given that Plaintiffs' response brief clearly sets forth the disputed facts in a section titled "Statement of Facts."  [Filing No. 267 at 9-20.]

Hoosiers baseball cap in the front right pocket of his pants and paper maps of Evansville in the front left pocket of his pants.  [Filing No. 256-4 at 4.]  He was wearing clothing that indicated that he may have been living in a homeless shelter.  [Filing No. 256-4 at 4.]

Kentucky State Police ("KSP") served as the lead investigators for two days until Marcus was identified as an Evansville resident.  [Filing No. 256-20 at 5.]  During an autopsy, KSP Medical Examiner Dr. Burrows-Beckham recovered a letter from the decedent's pocket.  The letter was from the Social Security Administration and was addressed to Marcus at an Evansville address.  [Filing No. 256-4 at 4.]  Dr. Burrows-Beckham contacted KSP Detective Jones on June 18, 2012 and "advised that the autopsy was completed and that she ruled the cause of death to be manual strangulation" because of trauma to and fracture of the hyoid bone in Marcus' neck.  [Filing No. 256-4 at 4-5; Filing No. 254-1 at 1.]  Dr. Burrows-Beckham also noted that one of Marcus' ribs was fractured and that it appeared to have occurred at the time of his death because of hemorrhaging around the tissue.  [Filing No. 256-4 at 5.]

KSP Detective Jones met with EPD Detective Vantlin, and they agreed that EPD would take the lead because "the incident most likely had taken place in Evansville."  [Filing No. 256-20 at 5.]  On June 27, 2012, Marcus' identity was conclusively determined through fingerprint analysis.  [Filing No. 256-4 at 5.]

**B.  Initial Investigation**

On June 20, 2012, KSP Detectives Wise and Jones and EPD Detective Vantlin talked to Debbie Hurt—Marcus' foster sister.  [Filing No. 254-1.]  Debbie is William, Deadra, and Andrea's mother—Deadra is Debbie's biological daughter, and Debbie later adopted William and Andrea. Debbie told the officers that Marcus had last been at her house on Saturday, June 16, 2012, and that she made him dinner and went to bed, but that Marcus stayed up playing chess with William

5

and then Marcus was gone in the morning.  [Filing No. 254-1 at 2.]  EPD Detective Vantlin also talked to William, who stated that Marcus was at Debbie's house on Thursday, June 14, 2012 and that they played a game of chess and talked for two hours.  [Filing No. 256-4 at 6.]  EPD Detective Vantlin told William that Debbie said Marcus was at the house on Saturday, June 16th, not on Thursday, June 14th, and William confirmed that it could have been Saturday, June 14th.  [Filing No. 254-1 at 3.]  EPD Detective Vantlin noticed that William had two minor abrasions on his right hand near his knuckles and that his hand appeared to be slightly swollen.  [Filing No. 254-1 at 3.]  William told EPD Detective Vantlin that he has anger issues and had punched a tree.  [Filing No. 254-1 at 3.]  William also pointed to an older wound and said he did it when grating laundry soap and that the newer skin breaks happened when he reached into the freezer at the ice cream shop where he works.  [Filing No. 254-1 at 3.]  According to KSP Detective Jones, William stated that he did not think he could pass a polygraph but that he would be willing to take one or come to EPD for further interviewing if needed.  [Filing No. 256-4 at 6.]

Debbie later called KSP Detective Jones and stated that her foster son Harley Wade had previously choked her almost to the point of her passing out and that she was scared he might be involved in Marcus' death.  [Filing No. 256-4 at 6.]  The detectives wanted to interview Harley, but because he was placed in foster care and a ward of Indiana, they could not interrogate him and "decided to move our focus to William Hurt."  [Filing No. 256-4 at 6.]

On June 28, 2012, EPD Detective Vantlin and KSP Detectives Wise and Jones went to the home of Marcus' brother and told him that Marcus' body had been recovered from the Ohio River.  [Filing No. 259.]  Marcus' brother's response was "[i]s it verified he was killed, other than jumping off a bridge?  Because he has been on that bridge three times before threatening to kill himself."  [Filing No. 259.]

### C. Interrogations and Confessions

On June 28, 2012, William went to EPD headquarters and signed a waiver of his *Miranda* rights.  [Filing No. 256-4 at 6; Filing No. 256-7 at 2.]  He was 18 years old at that time.  [Filing No. 256-24 at 27.]  William was interrogated for approximately five hours and ultimately confessed to being involved in Marcus' death and dumping his body in the Ohio River by the Dress Plaza.  [Filing No. 256-4 at 6-7; Filing No. 256-8 (transcript of interrogation).]  William stated that he, Deadra, Andrea, and Harley were in the Hurt's van when they saw Marcus.  [Filing No. 254-6 at 27-28.]  William said they stopped the van and were joking with Marcus and then it "started to get out of hand" and Harley got mad and started hitting Marcus.  [Filing No. 254-6 at 29.]  William said he also punched Marcus more than five times and then Harley choked Marcus.  [Filing No. 254-6 at 30-31.]  William said Marcus passed out and then Harley kicked him two or three times.  [Filing No. 254-6 at 33.]  William said they then tied Marcus up with sheets and put him in the back of the van.  [Filing No. 254-6 at 35-38.]  William said that Deadra was driving the van and that they dumped Marcus in the river.  [Filing No. 254-6 at 40-41.]  William said they then went to clean out the van at a gas station at 2 a.m. or 3 a.m. and then bought $20 to $30 of candy and other items from the Kangaroo convenience store and used Marcus' debit card.  [Filing No. 254-6 at 53-54; Filing No. 254-6 at 57-60.]  At the end of the interrogation, KSP Detective Jones told William, "[Y]ou did a good job.  You did all right.  It took you a while to get there, but you did."  [Filing No. 254-6 at 67.]  William responded, "Was I close to it?"  [Filing No. 254-6 at 68.]

The parties dispute the voluntariness of William's confession, which was videotaped.  [*See* Filing No. 252 (manually filed videotape of William's interrogation); Filing No. 258 at 4-5 (EPD Defendants' version of William's allegedly voluntary confession); Filing No. 257 at 6-9 (KSP

Defendants' version of William's allegedly voluntary confession); Filing No. 267 at 12-14 (Plaintiffs' version of William's allegedly involuntary confession).]

After William was interrogated, Deadra was arrested and signed a waiver of her *Miranda* rights at EPD headquarters.  [Filing No. 256-7 at 1; Filing No. 258 at 17.]  Deadra was 19 years old at that time.  [Filing No. 256-24 at 27-28.]  She was interrogated for approximately one hour and fifty-two minutes.  [Filing No. 256-9 (transcript of interrogation).]  Deadra was told that William had confessed and had told the officers that she had driven them to the river with Marcus unconscious in the back of the van.  [Filing No. 256-9 at 2.]  Deadra adamantly denied any involvement.  [Filing No. 256-9 at 2.]  Officers told her, among other things, that "[t]he only way that you're going to save your ass or anybody else's ass, is if you tell the truth.  If not, you're going to hang.  Do you understand this?"  [Filing No. 256-9 at 11.]  Ultimately, Deadra confessed to being involved in Marcus' death by driving the van.  [Filing No. 256-9 (transcript of interrogation).]

The parties dispute the voluntariness of Deadra's confession, which was videotaped.  [*See* Filing No. 252 (manually filed videotape of Deadra's interrogation); Filing No. 258 at 6-7 (EPD Defendants' version of Deadra's allegedly voluntary confession); Filing No. 257 at 9-11 (KSP Defendants' version of Deadra's allegedly voluntary confession); Filing No. 267 at 14-15 (Plaintiffs' version of Deadra's allegedly involuntary confession).]

After William and Deadra were interrogated, Andrea was brought in for questioning.  [Filing No. 258 at 18.]  She signed a juvenile waiver of her *Miranda* rights at EPD headquarters with her guardian, Ron Hurt, present.  [Filing No. 256-7 at 3.]  Andrea was 16 years old at that time.  [Filing No. 256-24 at 28.]  Andrea was interrogated for approximately two hours and sixteen minutes.  [Filing No. 252.]  She adamantly denied being present for or involved in Marcus' death,

even after being told that William and Deadra said she was in the van. [Filing No. 256-27.] Andrea later said that she had been in the van, but then she recanted the testimony. [Filing No. 256-27 at 22-28].

   The parties dispute the voluntariness of Andrea's confession, which was videotaped. [*See* Filing No. 252 (manually filed videotape of Andrea's interrogation); Filing No. 258 at 7-8 (EPD Defendants' version of Andrea's allegedly voluntary confession); Filing No. 257 at 11-12 (KSP Defendants' version of Andrea's allegedly voluntary confession); Filing No. 267 at 15-16 (Plaintiffs' version of Andrea's allegedly involuntary confession).]

### D.  Subsequent Investigation

   A police report by EPD Detective Spencer dated July 2, 2012 states that he took William to the Dress Plaza early on June 29, 2012 and that William directed him to the ramp where Marcus' body was dumped. [Filing No. 256-10 at 38.] The report indicates that William said he believed that Marcus was dead when he was thrown in the river. [Filing No. 256-10 at 38.] William attests that he never went to the Dress Plaza on June 29, 2012. [Filing No. 261-31.]

   EPD Detective Vantlin's police report details the extensive investigation he undertook to find corroborating evidence after Plaintiffs confessed to being involved in Marcus' death. [Filing No. 254-1 at 12-19.] On July 5, 2012, EPD Detective Vantlin learned that Marcus received approximately $527 per month from social security benefits. [Filing No. 254-1 at 14.] He later learned that there was no activity on Marcus' bank account between June 14th and the day he died. [Filing No. 254-1 at 15.] The last transaction on the account was for $30 at 1:44 pm on June 12, 2012, leaving a remaining balance of $0.08. [Filing No. 254-1 at 17.]

   EPD Detective Vantlin's report notes that during a prior interview with Marcus' brother, KSP Detective Jones "collected a letter . . . addressed to [Marcus] from the Social Security

Administration.  The letter indicated that [Marcus] had been overpaid and he owed them $726.00."
[Filing No. 254-1 at 17.]

Detective Vantlin visited the scene where Marcus' body was allegedly dumped, but he "did not locate any evidence from Marcus Golike or the suspects." [Filing No. 254-1 at 12.]  A search warrant was executed at Debbie Hurt's house, but no corroborating evidence was located.  [Filing No. 254-12 at 13.]

On July 6, 2012, EPD Detective Vantlin met with Sarah Richter, a clerk at the Kangaroo Express who worked the night of June 17, 2012.  [Filing No. 254-1 at 14.]  Detective Vantlin's report states that Ms. Richter told him that she "remembered some kids, possibly 4, come into the store between 2 AM and 4 AM.  They bought about $30.00 worth of candy and soda and used a debit card to pay for the items." [Filing No. 254-1 at 14.]  The Kangaroo Express surveillance video from the night of Marcus' death was unavailable because it had already been recorded over. [Filing No. 254-1 at 14.]  EPD Detective Vantlin reviewed surveillance video from other locations but "did not see any of the suspects associated with this case." [Filing No. 254-1 at 16.]

On July 26, 2012, Ms. Richter was shown four photo arrays.[4] [Filing No. 254-1 at 21-22.] The police report indicates that she was 60-70% certain she recognized the photo of a male who is not one of the Plaintiffs, stated that Harley and another male who is not one of the Plaintiffs "looked familiar," recognized Andrea "100%" as "one of the group in question," and recognized Deadra "80%." [Filing No. 254-1 at 21-22.]

In a declaration dated August 18, 2015, Ms. Richter attests that when she spoke with EPD Detective Vantlin, "I told him that I do not remember any kids coming into the store during those

---

[4] The police report lists Officer J. Dickinson as the officer that showed Ms. Richter the photo arrays.  [Filing No. 254-1 at 21.]  It states that he "was asked to do so by Sgt. L. Nelson for Det. J. Vantlin." [Filing No. 254-1 at 21.]

hours." [Filing No. 261-33.]  With regard to her alleged photo identifications, Ms. Richter attests as follows:

5.  The only other direct interaction I had with an Evansville police officer was a little while later, on a different day. That police officer came to the Kangaroo Express when I was working and asked me to look at photographs to see if I recognized any of the people in them. He showed me three or four large photographs. I told him that some of them looked familiar, but that I didn't know whether it was because I recognized them from seeing them on TV. I watch the news and had seen a lot of news reports about the four kids who were arrested for murdering their uncle.

6.  I told the police officer that kids usually come in the store during the daytime. Plus, the Kangaroo Express I worked at was located in a predominately African American neighborhood and I would have especially noticed three to four white kids in the store using a debit or credit card to pay for items.

[Filing No. 261-33.]

### E. Criminal Prosecutions

On June 30, 2012, a Vanderburgh Superior Court judge found probable cause to arrest William and Deadra for Murder, Attempted Robbery Resulting in Serious Bodily Injury, and Criminal Confinement.  [Filing No. 254-16 at 1-2; Filing No. 254-17 at 1-2.]  William was ultimately charged with Murder, Robbery Resulting in Serious Bodily Injury, and Obstruction of Justice and held in prison.  [Filing No. 254-16 at 3.]  Deadra was ultimately charged with Murder, Attempted Robbery Resulting in Serious Bodily Injury, and Obstruction of Justice and held in prison.  [Filing No. 254-17 at 3.]  The case against Andrea was dismissed before formal charges were filed.  [Filing No. 254-18 at 1.]

On August 31, 2012, Deadra filed a motion asking the trial court to suppress her confession. [Filing No. 254-17 at 5.]  On October 25, 2012, after hearing oral argument on the motion, the trial court granted it and suppressed Deadra's confession.  [Filing No. 254-17 at 6.]  The charges against Deadra were dismissed on October 30, 2012.  [Filing No. 254-17 at 7.]  Deadra was imprisoned for more than four months from the time of her arrest until her release.  [Filing No. 254-12.]

11

The trial court denied a motion to suppress William's confession.  [Filing No. 254-16 at 4-5.]  A pretrial conference was held on February 14, 2013, and EPD Detectives Pagett and Arbaugh stated that while transporting William to jail following his confession on June 28, 2012, William stated, "It's fine, I have to pay for what I did" and asked "[d]o you think they will just give me a year in jail for this?"  [Filing No. 254-22.]  EPD Detectives Pagett and Arbaugh were asked to record those statements in a supplemental case report and they did.  [Filing No. 254-22.]  William denies ever making those statements.  [Filing No. 254-25 at 34.]

A jury trial was held, and the jury found William not guilty of Murder and Robbery.  [Filing No. 254-16 at 10.]  The jury could not agree on a verdict for the Obstruction of Justice charge.  [Filing No. 254-25 at 10.]  William was imprisoned for approximately eight months from the time of his arrest until his release after the jury trial.  [Filing No. 254-16.]

### F. Federal Case

On June 27, 2014, Plaintiffs filed a Complaint in this Court, asserting various federal and state claims against the Defendants.  [Filing No. 1.]  It remains the operative Complaint, although the Court dismissed some of Plaintiffs' claims in an Order on Motion for Partial Judgment on the Pleadings.  [Filing No. 112.]  Plaintiffs subsequently filed a Statement of Claims, confirming that they assert the following claims in this litigation:

- Federal malicious prosecution pursuant to 42 U.S.C. § 1983 against the EPD Defendants and the KSP Defendants;

- A Fourth Amendment claim pursuant to 42 U.S.C. § 1983 against the EPD Defendants and the KSP Defendants;

- A Due Process claim pursuant to 42 U.S.C. § 1983 against the EPD Defendants, the KSP Defendants, and Dr. Burrows-Beckham;[5]

- A failure to intervene claim pursuant to 42 U.S.C. § 1983 against the EPD Defendants, the KSP Defendants, and Dr. Burrows-Beckham;

- Conspiracy to deprive constitutional rights pursuant to 42 U.S.C. § 1983 against the EPD Defendants, the KSP Defendants, and Dr. Burrows-Beckham;

- Supervisory liability pursuant to 42 U.S.C. § 1983 against EPD Sergeant Nelson;[6]

- A *Monell* claim pursuant to 42 U.S.C. § 1983 against the City;

- A state law claim for false arrest or false imprisonment against the EPD Defendants, the KSP Defendants, and the City;

- State law claims for malicious prosecution, intentional infliction of emotional distress, and defamation against the KSP Defendants; and

- Indemnification and *respondeat superior* state law claims against the City.

[Filing No. 120 (initial Statement of Claims); Filing No. 225 (reaffirming intention to pursue claims from initial Statement of Claims).]

---

[5] It is apparent from the parties' briefing that Plaintiffs bring both a Fifth Amendment due process claim and a Fourteenth Amendment substantive due process claim based on the interrogation tactics used and the self-incriminating statements obtained as a result. The Plaintiffs' vague Statement of Claims has hindered the Court's review by not specifying which claims Plaintiffs are pursuing which claims against which Defendants or identifying any specific legal bases for the generally identified claims. The Court has attempted to work through the parties' extensive briefing to address all claims pending in this litigation, but to the extent any were overlooked, they are considered waived for failure to develop a cogent argument.

[6] This claim is now dismissed due to the death of Sergeant. Nelson, as noted earlier.

13

The EPD Defendants, the City, the KSP Defendants, and Dr. Burrows-Beckham have all moved for summary judgment on all of Plaintiffs' claims against them.  [Filing No. 254; Filing No. 255; Filing No. 256.]  Those motions are now fully briefed and ready for the Court's decision.

### III.
#### DISCUSSION

### A.  Genuine Issues of Material Fact

The Court has reviewed the parties' briefs and the designated evidence they cite to support their arguments.  After doing so, the Court concludes that there are genuine issues of material fact surrounding key elements of this case, including whether Marcus committed suicide or was killed; whether the confessions of William, Deadra, and Andrea were voluntary or involuntary; and whether the evidence supports the notion that various officers acted with malice and had an agreement to implicate Plaintiffs during the interrogations and subsequent investigation.

The following chart, which is based on a sample of the evidence relied on by the parties on summary judgment, summarizes some examples of these genuine issues of material fact:

| Issue of Material Fact | Evidence Plaintiffs Cite for their Conclusion | Evidence Defendants Cite for their Conclusion |
|---|---|---|
| Whether Marcus committed suicide or was killed | Marcus Committed Suicide<br>- Marcus suffered from mental illness and had threatened to commit suicide by jumping off the bridge by where his body was found at least three times<br>- Body found four to six miles upstream from where Plaintiffs allegedly dumped it<br>- Letter from Social Security Administration in plastic bag in Marcus' pocket, possibly indicating he wanted to preserve letter for body identification after suicide<br>- No external injuries to body from alleged beating or alleged | Marcus Was Killed<br>- Hyoid bone in neck broken, which indicated homicide by strangulation to medical examiner<br>- Rib broken around time of death<br>- William's cuts on hands and changing story<br>- Harley's prior aggressive behavior with Debbie, including pretending to strangle her |

| | | |
|---|---|---|
| | boat dragging body four to six miles upstream<br>- No forensic evidence linking Plaintiffs to Marcus' body or Marcus' body to van where Plaintiffs allegedly transported him | |
| Voluntariness of William's Confession | <u>William Confession Involuntary</u><br>- Videotape of Interrogation<br>- Young Age (18)<br>- Interrogation tactics included feeding William story about alleged murder, lying about evidence, and telling him he was facing "prison forever" and then a "fate worse than prison"<br>- At the end of his confession he stated "Was [I right] on most of the facts of what actually happened or . . .?  Was I close to it?"<br>- Acquitted on Murder and Robbery charges after jury trial | <u>William Confession Voluntary</u><br>- Videotape of Interrogation<br>- Multiple explanations for swollen hands and admitted anger issues<br>- Signed *Miranda* waiver<br>- Not physically harmed or denied food during interrogation<br>- Some corroborating evidence, such as William knowing the pocket where Marcus' folded hat was found |
| Voluntariness of Deadra's Confession | <u>Deadra Confession Involuntary</u><br>- Videotape of Interrogation<br>- Young Age (19)<br>- Told William had confessed and implicated her<br>- Deadra twice asked for a lie detector test and was denied<br>- Interrogation tactics included feeding Deadra story about alleged murder, telling her she was going to go to prison for 25-50 years, that she was going "to hang," and that her family members would be hurt unless she told the truth<br>- Confession suppressed by trial court | <u>Deadra Confession Voluntary</u><br>- Videotape of Interrogation<br>- Signed *Miranda* waiver<br>- Not physically harmed or denied food during interrogation<br>- William confessed and implicated her |

15

| Voluntariness of Andrea's Confession | Andrea Confession Involuntary<br>- Videotape of Interrogation<br>- Young Age (16)<br>- Andrea told that William and Deadra had confessed and implicated her<br>- Interrogation tactics included threatening Andrea that they could make her "bawl [her] eyes out" and telling her what newspaper would say about her<br>- Andrea confessed and then recanted, stating that "[t]he only reason I said I was there was cause that's what you told me."<br>- State dismissed criminal case before formal charges filed | Andrea Confession Voluntary<br>- Videotape of Interrogation<br>- Signed juvenile *Miranda* waiver<br>- Not physically harmed or denied food during interrogation<br>- William and Deadra confessed and implicated her |
| Whether Officers had Malice and Agreement to Implicate Plaintiffs | Officers Had Malice and Agreement<br>- EPD Detective Spencer allegedly fabricated police report of trip to Dress Plaza with William on June 29, 2012, where William allegedly showed him where Marcus' body was dumped.  William denies this trip happened.<br>- EPD Detective Vantlin allegedly fabricated police report of Kangaroo Express clerk recalling four teens being at store and using debt card night of June 17, 2012.  Plaintiffs cite affidavit from clerk stating that she told police she did not remember any kids coming into the store during those hours.<br>- EPD Officer Dickinson allegedly fabricated police report of Kangaroo Express clerk identifying some of the Plaintiffs in a photo array.  Plaintiffs cite affidavit from clerk stating that while she told him some looked familiar, she didn't know if it was from seeing them on TV. | Officers Did Not Have Malice or Agreement<br>- Defendants deny fabricating any evidence or having agreement to implicate Plaintiffs<br>- Defendants claim no motive to do so |

16

| | | |
|---|---|---|
| | - EPD Detectives Arbaugh and Pagett allegedly fabricated police report seven months after they say William made inculpatory statements in police car, which he denies.<br>- Lack of physical evidence to corroborate alleged story of crime—no evidence Marcus' debit card used, no evidence of Plaintiffs in Kangaroo Express or where body allegedly dumped, and no evidence of motive | |

## B.  Generally Applicable Federal Law

Plaintiffs assert their federal claims pursuant to 42 U.S.C. § 1983.  Section 1983 provides that "[e]very person who, under color of any . . . State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in the action at law." 42 U.S.C. § 1983.  A § 1983 claim allows a plaintiff to seek money damages from government officials who have violated his or her constitutional rights.  *Wilson v. Layne*, 526 U.S. 603, 609 (1999).  A damages suit under § 1983 requires that a defendant be personally involved in the alleged constitutional deprivation.  *Matz v. Klotka*, 769 F.3d 517, 528 (7th Cir. 2014).  "Moreover, under § 1983, a plaintiff may not rely on the doctrine of *respondeat superior* to hold supervisory officials liable for the misconduct of their subordinates." *Id.*  "Rather, the supervisory officials also must have had some personal involvement in the constitutional deprivation, essentially directing or consenting to the challenged conduct." *Doyle v. Camelot Care Centers, Inc.*, 305 F.3d 603, 614-15 (7th Cir. 2002).

"Government officials performing discretionary functions enjoy a qualified immunity . . . ." *Leaf v. Shelnutt*, 400 F.3d 1070, 1079 (7th Cir. 2005).  It is "*immunity from suit*

rather than a mere defense to liability." *Estate of Miller, ex rel. Bertram v. Tobiasz*, 680 F.3d 984, 988 (7th Cir. 2012) (emphasis in original) (citation and quotation marks omitted).  "Qualified immunity gives government officials 'the benefit of legal doubts.'" *Rooni v. Biser*, 742 F.3d 737, 743 (7th Cir. 2014) (quoting *Elliott v. Thomas*, 937 F.2d 338, 341 (7th Cir. 1991)); *see Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013) ("Qualified immunity protects public servants from liability for reasonable mistakes made while performing their public duties.").  Its purpose is "to provide reasonable notice to government officials that certain conduct violates constitutional rights before a plaintiff can subject them to liability." *Narducci v. Moore*, 572 F.3d 313, 318 (7th Cir. 2009).  "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  "Once the defense of qualified immunity is raised, 'it becomes the plaintiff's burden to defeat it.'" *Estate of Escobedo v. Martin*, 702 F.3d 388, 404 (7th Cir. 2012) (quoting *Wheeler v. Lawson*, 539 F.3d 629, 639 (7th Cir. 2008)).

   "To determine whether a defendant is entitled to qualified immunity, courts must address two issues: (1) whether the defendant violated the plaintiff's constitutional rights and (2) whether the right at issue was clearly established at the time of the violation." *Rooni*, 742 F.3d at 742 (citation omitted).  The Court may decide these factors in either order. *Miller v. Harbaugh*, 698 F.3d 956, 962 (7th Cir. 2012).  If the right at issue was not clearly established at the time of the violation, the Court may exercise its discretion not to determine whether the defendant violated that plaintiff's constitutional right.  *See Pearson*, 555 U.S. at 236 ("[T]he judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding

which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

To determine whether a right is clearly established, the Court looks to controlling precedent from both the Supreme Court of the United States and the Seventh Circuit Court of Appeals, and if there is no such precedent it "cast[s] a wider net" and examines "all relevant case law to determine whether there was such a clear trend in the case law that [it] can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time." *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 731 (7th Cir. 2013). "To be clearly established at the time of the challenged conduct, the right's contours must be 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right,' and 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Rabin v. Flynn*, 725 F.3d 628, 632 (7th Cir. 2013) (quoting *Humphries v. Milwaukee Cnty.*, 702 F.3d 1003, 1006 (7th Cir. 2012)).

### C.  Plaintiffs' Claims Against Dr. Burrows-Beckham

Plaintiffs assert multiple claims against Dr. Burrows-Beckham pursuant to 42 U.S.C. § 1983, including due process violations, failure to intervene, and conspiracy.  [Filing No. 120 (initial Statement of Claims); Filing No. 225 (reaffirming intention to pursue claims from initial Statement of Claims).]  Dr. Burrows-Beckham moves for summary judgment on these claims, emphasizing that "[i]t is undisputed that Dr. Burrows-Beckham formulated her opinion as to the cause and manner of [Mr.] Golike's death prior to any contact with any law enforcement agency on June 19, 2012." [Filing No. 255-1 at 11.]  Dr. Burrows-Beckham argues that she is entitled to qualified immunity and summary judgment on all of Plaintiffs' claims because she independently reached the conclusion regarding the cause of Mr. Golike's death before the events affecting the

analysis of the due process, failure to intervene, and conspiracy claims took place.  [Filing No. 255-1 at 7-12.]

In response, Plaintiffs concede that Dr. Burrows-Beckham is entitled to summary judgment on their failure to intervene claim.  [Filing No. 264 at 2.]  They dispute, however, that summary judgment should be entered on the due process and conspiracy claims because "[Dr.] Burrows-Beckham's extreme contortion of reality and her deviation from standard medical norms to do so were part of Defendants' plot to frame Plaintiffs for a murder that never happened."  [Filing No. 264 at 2.]  They emphasize that Dr. Burrows-Beckham's initial conclusion at the time of the autopsy was "asphyxia consistent with strangulation" and that she did not make a final conclusion of "asphyxia and blunt force injuries sustained in an assault" until after speaking with KSP Detective Jones.  [Filing No. 264 at 5.]  Plaintiffs' expert, Dr. James Filkins, opines that based on the record evidence, there was insufficient medical and pathological evidence to conclude with a reasonable degree of medical certainty that Mr. Golike died from asphyxia and blunt force injuries sustained in an assault.  [Filing No. 261-4 at 10.]  Instead, Dr. Filkins concludes that the evidence supports a finding of an "undetermined" cause of death.  [Filing No. 261-4 at 10.]

In reply, Dr. Burrows-Beckham emphasizes her handwritten notes, which confirm that she quickly concluded that the hyoid bone fracture was not from a fall or jump from a bridge before she had any contact with police or even knew that the body was that of Mr. Golike.  [Filing No. 277 at 2-3.]  Dr. Burrows-Beckham contends that because she reached that result without any police influence, there is no evidence that she was involved in any alleged constitutional violation and summary judgment should be entered in her favor.  [Filing No. 227 at 6-7.]  She also emphasizes that Plaintiffs' expert found no evidence that she intentionally misrepresented anything or that she dishonestly arrived at her opinions.  [Filing No. 277 at 7.]  Dr. Burrows-Beckham

further emphasizes that Plaintiffs' expert did not conclude that Mr. Golike's death should be ruled a suicide, and he concedes he cannot exclude murder. [Filing No. 277 at 7.]

Plaintiffs do not dispute that Dr. Burrows-Beckham was a state actor at the time she performed the autopsy and made her findings regarding the cause of Marcus' death. *See Kompare v. Stein*, 801 F.2d 883, 887 (7th Cir. 1986) ("The medical examiner's function in performing an autopsy is analogous to that of a police officer investigating a suspected homicide. Therefore, coroners enjoy the same qualified immunity as police officers or other investigators for the state prosecutor."); *Estate of Conner by Conner v. Ambrose*, 990 F. Supp. 606, 617 (N.D. Ind. 1997) ("As a coroner, determining the cause of death is a state function."). While Plaintiffs dispute that Dr. Burrows-Beckham is entitled to the defense of qualified immunity, they do not dispute that she may invoke it at this stage of the proceedings. *Kompare*, 801 F.2d at 887.

As set forth above, "[t]o determine whether a defendant is entitled to qualified immunity, courts must address two issues: (1) whether the defendant violated the plaintiff's constitutional rights and (2) whether the right at issue was clearly established at the time of the violation." *Rooni*, 742 F.3d at 742 (citation omitted). The Court may decide these factors in either order. *Miller*, 698 F.3d at 962.

The Court will first consider whether Dr. Burrows-Beckham violated Plaintiffs' constitutional rights. Plaintiffs allege that Dr. Burrows-Beckham violated their constitutional right to due process because "she distorted her final cause of death finding in order to falsely suggest there was uncontrovertibly a murder when, in fact, she knew that a suicide was probable." [Filing No. 264 at 8.] Put another way, Plaintiffs claim that Dr. Burrows-Beckham "manufactured false evidence"—namely, a cause of death indicating criminal behavior rather than suicide. They claim that "[c]rediting Plaintiffs' evidence, it appears that after Burrows-Beckham learned that the

detectives wanted a homicide, she leapt through considerable hoops to deny the likelihood that this death was a suicide." [Filing No. 264 at 2.]

The undisputed evidence shows that Marcus' body arrived at the Henderson County Coroner's Office on June 17, 2012. [Filing No. 276-1 at 1.] The intake form listed "poss[ible] drowning" as the possible cause of death. [Filing No. 276-1 at 1.] Dr. Burrows-Beckham performed an autopsy on June 18, 2012, and her initial report indicates that her findings for the "unidentified male" were "consistent with asphyxia via strangulation," citing the body's fractured hyoid bone, broken rib, and that it was found in the river.[7] [Filing No. 276-2.] After the body was tentatively identified as Marcus, a handwritten note from Dr. Burrows-Beckham dated June 20, 2012 confirms that the police told her that Marcus had previously threatened to commit suicide by jumping off the bridge. [Filing No. 276-1 at 3.] But a handwritten note from Dr. Burrows-Beckham the following day confirms her intention to tell EPD that she did not think the fractured hyoid bone in Marcus' neck was from a jump or fall from the bridge. [Filing No. 277 at 3 ("Tell him don't think fx hyoid from fall/jump into river from bridge.").]

Plaintiffs are correct that a state actor who manufactures false evidence that is used to deprive liberty violates clearly established constitutional rights. *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012). False evidence is evidence that is "known to be untrue by the witness." *Fields v. Wharrie*, 740 F.3d 1107, 1110 (7th Cir. 2014). "[W]hen the question is whether to grant immunity to a public employee, the focus is on [her] conduct, not on whether that conduct gave rise" to another cause of action in the case. *Id.* at 1114.

Based on the undisputed evidence detailed above, the Court agrees with Dr. Burrows-Beckham that no reasonable jury could conclude that she violated Plaintiffs' constitutional rights

---

[7] At some later point, "unidentified male" was crossed out and replaced with Marcus' name.

22

by manufacturing false evidence at the direction of other Defendants.  It is undisputed that Marcus'
body had a broken hyoid bone and a broken rib and that based on those findings, Dr. Burrows-
Beckham concluded the day after the body was found that the cause of death was "consistent with
asphyxia via strangulation."  [Filing No. 276-2.]  It is also undisputed that Dr. Burrows-Beckham
reached that conclusion before Marcus' identity was confirmed and that she maintained it despite
receiving information from the police that Marcus had previously threatened to commit suicide by
jumping from that bridge.   While Plaintiffs emphasize that Dr. Burrows-Beckham's final
conclusion regarding Marcus' cause of death was "asphyxia and blunt force injuries sustained in
an assault"—not her initial conclusion of "asphyxia via strangulation"—this is a distinction
without a difference because both indicate criminal activity, not suicide.

In sum, the undisputed evidence does not support Plaintiffs' version of events that Dr.
Burrows-Beckham violated their constitutional right to due process by allegedly manufacturing
false evidence.  Even making all reasonable inferences in Plaintiffs' favor, the evidence confirms
that Dr. Burrows-Beckham quickly reached a conclusion that Marcus' death was not a suicide
based on undisputed injuries she found, informed the police of that conclusion, and never wavered.
The Court's conclusion that Plaintiffs have not put forth evidence of a constitutional violation also
dooms their federal conspiracy claim against Dr. Burrows-Beckham.  *See Katz-Crank v. Haskett*,
843 F.3d 641, 650 (7th Cir. 2016) ("Without a viable federal constitutional claim, the conspiracy
claim under § 1983 necessarily fails; there is no independent cause of action for § 1983
conspiracy.").   Accordingly, the Court concludes that Dr. Burrows-Beckham is entitled to
summary judgment as a matter of law on Plaintiffs' claims against her.

### D.  Plaintiffs' Federal Claims against the EPD and KSP Defendants

*1)  § 1983 Claim for False Arrest in violation of the Fourth Amendment*

Plaintiffs assert a § 1983 false arrest claim pursuant to the Fourth Amendment against the EPD and the KSP Defendants, [Filing No. 120; Filing No. 225], and the EPD and KSP Defendants ask for summary judgment in their favor on that claim.  It is undisputed that EPD Detective Vantlin and KSP Detectives Wise and Jones were the only Defendants involved in the interrogations that led to Plaintiffs' arrests.[8]  [Filing No. 257 at 3-4 (citing Filing No. 256-20 at 20-21).]  The parties vehemently dispute whether probable cause existed at the time each Plaintiff was arrested, challenging the voluntariness of each Plaintiff's confession in the process.  [Filing No. 258 at 14-20; Filing No. 257 at 16-22; Filing No. 267 at 22-36; Filing No. 268 at 21-37.]

A claim that a plaintiff was arrested without probable cause is a claim for false arrest under the Fourth Amendment.  *Serino v. Hensley*, 735 F.3d 588, 593 (7th Cir. 2013) ("The Fourth Amendment, not the due process clause, is the proper basis for challenging the lawfulness of an arrest.") (citing *Alexander v. McKinney*, 692 F.3d 553, 558 (7th Cir. 2012)).  Establishing that probable cause existed to arrest a plaintiff "is an absolute defense" to a Fourth Amendment false arrest claim.  *Gonzalez v. City of Elgin*, 578 F.3d 526, 537 (7th Cir. 2009).

Probable cause to arrest a person exists if, at the time of the arrest, the facts and circumstances "are sufficient to warrant a prudent person, or one of reasonable caution, in

---

[8] The EPD Defendants argue that EPD Detectives Arbaugh, Pagett, and Spencer were not involved in Plaintiffs' interrogations and arrests.  [Filing No. 258 at 20-22.]  They ask for summary judgment on Plaintiffs' false arrest claims against those officers because they were not personally involved in the alleged constitutional deprivation underlying the false arrest claim, as is required to succeed on a § 1983 claim.  *Matz*, 769 F.3d at 528.  As the EPD Defendants point out in their reply brief, [Filing No. 278 at 2], Plaintiffs did not respond to this argument, [Filing No. 267].  Therefore, the Court grants summary judgment in favor of EPD Detectives Arbaugh, Pagett, and Spencer on Plaintiffs' Fourth Amendment false arrest claims against them.

24

believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Id.* The Court may decide whether probable cause exists "[o]nly if the underlying facts claimed to support probable cause are not in dispute." *Id.* If those facts are in dispute, then "[t]he jury must determine the existence of probable cause." *Id.*; *see also Maxwell v. City of Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1993) ("While many formulations for probable cause exist, all refer to the exercise of judgment, which turns on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules. These sorts of assessments typically would fall within the province of the jury, which determines whether probable cause existed in a given case . . . .") (citations omitted). "[A] conclusion that probable cause existed as a matter of law is appropriate only when no reasonable jury could find that the officers did not have probable cause to arrest [plaintiff]." *Maxwell*, 998 F.2d at 434.

Determining whether probable cause existed at the time of an arrest requires determining when a person was under arrest. *Fox v. Hayes*, 600 F.3d 819, 833 (7th Cir. 2010).[9] "An arrest occurs when, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.* (citation omitted). Various factors to consider when analyzing whether a person was under arrest include whether he asked to leave, whether the police informed him that he is suspected of a crime, whether his movement is limited, whether officers engage in coercive conduct suggesting that cooperation is required, and whether he is in a private location. *Id.* Administering *Miranda* warnings may give a clear indication that

---

[9] *Fox* stems from a civil suit following a jury verdict in favor of a father who was charged with killing his daughter and imprisoned for eight months before DNA evidence exonerated him. 600 F.3d at 819. The jury in Mr. Fox's civil suit found in his favor and awarded him $15,500,000. *Id.* Although the procedural posture of *Fox* differs from the procedural posture in the summary judgment context at bar, the Seventh Circuit's guidance in *Fox* is still helpful because the evidence on appeal in that case also had to be viewed in a light most favorable to the plaintiff, which the Seventh Circuit emphasized many times in its decision. *Id.* at 826.

a person is considered a suspect and may be under arrest. *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1018 (7th Cir. 2006). Whether probable cause existed at the moment of an arrest "requires a close look at the facts" of a case. *Fox*, 600 F.3d at 833. While officers need not have enough evidence to support a conviction or even to show that their belief is more likely true than false, they "must have more than a bare suspicion that they have the right guy." *Id.* Officers cannot ignore disputed facts, rely on facts without regard to the full context of the circumstances known to them, or "interpret the relatively lenient probable cause standard as license to rely on their version of the events." *Id.* at 834. Instead, on summary judgment, plaintiffs' version "carries the day." *Id.* At bottom, to have probable cause, officers need "concrete facts sufficient to elevate their hunch . . . to a reasonable belief." *Id.* at 835.

"A confession is voluntary if the totality of the circumstances demonstrates that it was the product of rational intellect and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics calculated to overcome the defendant's free will." *Watson v. DeTella*, 122 F.3d 450, 453 (7th Cir. 1997); *see United States v. Murdock*, 491 F.3d 694, 699 (7th Cir. 2007) (holding that statements are involuntary only where obtained through coercion or overreaching as to "overbore the accused's free will"). Because a confession should not be the product of "youthful ignorance or the naiveté born of inexperience," the defendant's "age, intelligence, education, and experience with the criminal justice system" are also considered. *Watson*, 122 F.3d at 453. "Threats to a suspect's family or children, even if implicit, certainly may render confessions involuntary . . . ." *Sornberger*, 434 F.3d at 1023. Genuine issues of material fact regarding the voluntariness of a person's confession preclude summary judgment. *Id.*

a) William's Arrest

Plaintiffs make a cursory argument that William was seized for Fourth Amendment purposes when he was "ordered to go to the police station, *Mirandized*, and interrogated." [Filing No. 267 at 20.] The evidence they cite, however, includes William's admissions at his deposition that he voluntarily went to the police station after his mother told him to, that he was not under arrest when he got there, and that he was arrested when he left the interview room. [Filing No. 261-22 at 5-11]. Based on William's testimony, the Court agrees with the Defendants that William was not under arrest as a matter of law when he went to the police station.

The Court concludes, however, that reasonable minds could differ regarding whether probable cause existed for William's arrest after his interrogation because of the genuine issues of material fact surrounding the voluntariness of his confession:

| Issue of Material Fact | Sample Evidence Plaintiffs Cite for their Conclusion | Sample Evidence Defendants Cite for their Conclusion |
|---|---|---|
| Voluntariness of William's Confession | William Confession Involuntary<br>- Videotape of Interrogation<br>- Young Age (18)<br>- Interrogation tactics included feeding William story about alleged murder, lying about evidence, and telling him he was facing "prison forever" and then a "fate worse than prison"<br>- At the end of his confession he stated "Was [I right] on most of the facts of what actually happened or . . .? Was I close to it?"<br>- Acquitted on Murder and Robbery charges after jury trial | William Confession Voluntary<br>- Videotape of Interrogation<br>- Multiple explanations for swollen hands and admitted anger issues<br>- Signed *Miranda* waiver<br>- Not physically harmed or denied food during interrogation<br>- Some corroborating evidence, such as William knowing the pocket where Marcus' folded hat was found |

If the jury credits the evidence Plaintiffs cite, it could reasonably conclude that William's confession was coerced and that it was objectively unreasonable for the officers to believe that

probable cause existed to arrest him.[10]  But if the jury credits the evidence Defendants cite, it could reasonably conclude that William's confession was voluntary and that it was objectively reasonable for officers to believe probable cause to arrest him existed.  The Court's conclusion that there is a genuine dispute of material fact on this point is bolstered by the fact that both parties rely on the video recording of William's interrogation to support their desired conclusion regarding probable cause.  The jury can watch that video, consider it in the context of the circumstances known at that time—including the issues of material fact surrounding Marcus' death—and determine whether the officers had an objectively reasonable basis to elevate their hunch to a reasonable belief that William had committed a crime.

At this stage of the proceedings, the Court must make all reasonable inferences in William's favor.  Doing so precludes it from finding that probable cause existed as a matter of law at the time of his arrest.  *See Fox*, 600 F.3d at 834 ("The defendants present a laundry list of facts (three pages of bullet points in their opening brief) that they believe support a probable cause finding. Their list suffers from many shortcomings, the most serious being that it is comprised largely of disputed facts. . . .  It is true that probable cause is determined from the perspective of what the officers knew at the time of the arrest, but that does not mean that the jury was compelled to believe the officers' testimony in reaching a probable cause determination."); *see also Maxwell*, 998 F.2d at 434 ("[O]n the other hand, if the question of probable cause arises in a damages suit, it is a proper issue for the jury if there is room for a difference of opinion concerning the facts or

---

[10] In their response briefs, Plaintiffs argue that probable cause did not exist to arrest William if the confession is not considered.  [Filing No. 267 at 28-30; Filing No. 268 at 28-30.]  Defendants did not reply to this argument.  [Filing No. 273; Filing No. 278.]  Given the previously detailed issues of material fact surrounding Marcus' death—including that his body was found four to six miles upstream from where Plaintiffs allegedly dumped it—even if Defendants had argued that probable cause existed for William's arrest without the confession, the Court would not have agreed as a matter of law on summary judgment.

the reasonable inferences to be drawn from them.  Accordingly, a conclusion that probable cause existed as a matter of law is appropriate only when no reasonable jury could find that the officers did not have probable cause to arrest [plaintiff].") (citations omitted).  Moreover, given the circumstances and the genuine issue of material fact surrounding the voluntariness of William's confession, the Court agrees with Plaintiffs that Defendants cannot rely on the prosecutor's subsequent decision to charge William as evidence that probable cause existed at the time of his arrest.  *See Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir. 1988) ("a prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial—none of these decisions will shield a police officer who deliberately supplied misleading information that influenced the decision").

Defendants also invoke qualified immunity.  [Filing No. 258 at 40-41; Filing No. 257 at 43-44.]  When the constitutionality of an officer's action depends on the existence of probable cause, the officer must have had "arguable probable cause" for qualified immunity to attach. *Bruce v. Guernsey*, 777 F.3d 872, 878 (7th Cir. 2015) (citing *Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir. 1998)).  "[E]ven when an officer lacks probable cause, he is still entitled to qualified immunity when a reasonable officer could have reasonably believed that probable cause existed in light of well-established law." *Bruce*, 777 F.3d at 878-79 (citation omitted).  In this context, qualified immunity provides shelter for officers who have "arguable probable cause" to arrest— *i.e.*, those officers that reasonably but mistakenly believe they have probable cause. *Gutierrez v. Kermon*, 722 F.3d 1003, 1008 (7th Cir. 2013).  As Plaintiffs point out in response to Defendants' qualified immunity argument, however, the numerous genuine issues of material fact in this case result in a "substantial, if not complete, overlap of the issue of immunity and the principle issue on the merits."  [Filing No. 267 at 22 (citing *Maxwell*, 998 F.2d at 435).]  The Court cannot

conclude that EPD Detective Vantlin and KSP Detectives Wise and Jones are entitled to qualified immunity on William's § 1983 false arrest claim at this juncture.  *See Maxwell*, 998 F.2d at 435 ("In effect, we have come full circle on the probable cause question.  Because we have already established that the conclusion by the three officers concerning the existence of probable cause may be found to be objectively unreasonable, they are not entitled to qualified immunity at this juncture.").  Accordingly, the Court rejects their request for summary judgment on William's false arrest claim.

b) Deadra's Arrest

Defendants concede that Deadra was arrested before her confession.  [Filing No. 258 at 6 (EPD Defendants' brief); Filing No. 257 at 9 (KSP Defendants' brief).]  Because the existence of probable cause is analyzed at the time of arrest, the probable cause inquiry turns on the evidence and circumstances known to the officers at the time of arrest.  *Wheeler v. Lawson*, 539 F.3d 629, 637 (7th Cir. 2008).  Any evidence that came to light after Deadra's arrest—such as her confession or Andrea's subsequent confession—is not relevant to the probable cause inquiry regarding Deadra's arrest.  *Id.*  Because the alleged probable cause for Deadra's arrest hinges on William's allegedly coerced confession implicating her, the Court must deny summary judgment on Deadra's false arrest claim for the same reasons it concluded that EPD Detective Vantlin and KSP Detectives Wise and Jones were not entitled to qualified immunity or summary judgment on William's false arrest claim.[11]

---

[11] The EPD Defendants briefly argue that a plaintiff cannot attack the constitutionality of another plaintiff's interrogation, [Filing No. 278 at 8], but the case on which they rely for that argument analyzes an Illinois state law malicious prosecution claim and does not support their position, *see Cairel v. Alderden*, 821 F.3d 823, 834-35 (7th Cir. 2016) (emphasizing the additional evidence supporting probable cause other than the allegedly coerced confession, including two victims identifying the party who later confessed).  Deadra does not make an independent claim attacking the constitutionality of William's confession; instead, she challenges the existence of probable

30

c) Andrea's Arrest

The EPD Defendants concede that Andrea was arrested prior to her interrogation. [Filing No. 258 at 18.] The KSP Defendants do not make this concession. [Filing No. 257 at 11.] If Andrea was arrested before her confession, the alleged probable cause for that arrest was based on the allegedly coerced confessions of William and Deadra implicating her. If Andrea was arrested after her confession, then the alleged probable cause was based on her own allegedly coerced confession and the allegedly coerced confessions of William and Deadra. Either way, the Court concludes that reasonable minds could differ regarding whether probable cause existed for Andrea's arrest because of the identified genuine issues of material fact surrounding the voluntariness of William's confession (previously detailed) and the voluntariness of Andrea and Deadra's confessions:

| Issue of Material Fact | Sample Evidence Plaintiffs Cite for their Conclusion | Sample Evidence Defendants Cite for their Conclusion |
|---|---|---|
| Voluntariness of Deadra's Confession | Deadra Confession Involuntary<br>- Videotape of Interrogation<br>- Young Age (19)<br>- Told William had confessed and implicated her<br>- Deadra twice asked for a lie detector test and was denied<br>- Interrogation tactics included feeding Deadra story about alleged murder, telling her she was going to go to prison for 25-50 years, that she was going "to hang," and that her family members would be hurt unless she told the truth<br>- Confession suppressed by trial court | Deadra Confession Voluntary<br>- Videotape of Interrogation<br>- Signed *Miranda* waiver<br>- Not physically harmed or denied food during interrogation<br>- William confessed and implicated her |

---

cause to support *her arrest* based on the information the officers knew at that time, which includes William's allegedly coerced confession.

| Voluntariness of Andrea's Confession | Andrea Confession Involuntary | Andrea Confession Voluntary |
|---|---|---|
| | - Videotape of Interrogation<br>- Young Age (16)<br>- Andrea told that William and Deadra had confessed and implicated her<br>- Interrogation tactics included threatening Andrea that they could make her "bawl [her] eyes out" and telling her what newspaper would say about her<br>- Andrea confessed and then recanted, stating that "[t]he only reason I said I was there was cause that's what you told me."<br>- State dismissed criminal case before formal charges filed | - Videotape of Interrogation<br>- Signed juvenile *Miranda* waiver<br>- Not physically harmed or denied food during interrogation<br>- William and Deadra confessed and implicated her |

Plaintiffs' version of the facts must carry the day at this stage of the litigation, and for the reasons that the Court denied qualified immunity and summary judgment on William and Deadra's false arrest claims, the Court must also conclude that EPD Detective Vantlin and KSP Detectives Wise and Jones are not entitled to qualified immunity or summary judgment on Andrea's false arrest claim.

### 2) Fifth and Fourteenth Amendment Due Process Claims Based on Interrogations

Plaintiffs assert a Fifth Amendment due process claim for allegedly being coerced into making self-incriminating statements, [Filing No. 267 at 41-46], and a Fourteenth Amendment substantive due process claim for the interrogation tactics the Defendants used, [Filing No. 267 at 52-53]. Plaintiffs have previously clarified "that their due process claim is only on behalf of William and Deadra, since they were the two that allege they were deprived of their liberty between the time of their arrests and the point where they were released." [Filing No. 112 at 12-13 (citing Filing No. 80 at 20).] While Plaintiffs do not expressly state which Defendants they pursue this claim against, because EPD Detective Vantlin and KSP Detectives Wise and Jones were the only

officers personally involved in William and Deadra's interrogations, the due process claims may only proceed against them.  Accordingly, the Court enters summary judgment in favor of EPD Detectives Arbaugh, Pagett, and Spencer, to the extent Plaintiffs asserted due process claims against them.

The Fifth Amendment privilege against self-incrimination "concerns the use of compelled statements in criminal prosecutions." *Matz v. Klotka*, 769 F.3d 517, 530 (7th Cir. 2014).  To be violated, it requires "at the very least, the initiation of a legal proceeding, rather than mere police questioning, before a suspect's self-incrimination rights are implicated." *Sornberger*, 434 F.3d at 1024.  Consequently, a person who incriminates herself but is never prosecuted—like Andrea— cannot successfully pursue a due process claim based on the allegedly compelled self- incrimination.  *Id.*  The incriminating testimony need not be actually introduced at trial to be "used" for purposes of the Self-Incrimination Clause.  *Id.*  The fact that Deadra's allegedly coerced confession was used against her in the probable cause affidavit and at a pretrial hearing but not at trial—since her criminal case was dismissed before trial after the trial court suppressed her confession—is sufficient to state a due process claim.  *Id.*

Likewise, a Fourteenth Amendment substantive due process claim based on an interrogation will "depend upon the coercive nature of the interrogation." *Gill v. City of Milwaukee*, --- F.3d ---, 2017 WL 897344, at *3 (7th Cir. 2017); *see also Cairel v. Alderden*, 821 F.3d 823, 833 (7th Cir. 2016) (holding that a plaintiff may bring a § 1983 substantive due process claim pursuant to the Fourteenth Amendment for police behavior that "shocks the conscience," including "conscience-shocking interrogation tactics").  "Determining what constitutes such behavior can be difficult; the ultimate question is whether the conduct is too close to the rack and the screw." *Cairel*, 821 F.3d at 833 (citation omitted).  The "official conduct most likely to rise to

the conscience-shocking level is the conduct intended to injure in some way unjustifiable by any government interest." *Id.*

William and Deadra argue that issues of material fact preclude summary judgment on their due process claims based on the allegedly compelled self-incrimination because the parties vehemently dispute whether William and Deadra's confessions were coerced or voluntary. [Filing No. 267 at 41-46.] While Defendants dispute that argument, the Court has already found that genuine issues of material fact preclude the Court from finding William and Deadra's confessions to be voluntary as a matter of law. Moreover, it is certainly reasonable to conclude that a jury could find that William and Deadra's allegations about the interrogation tactics shock the conscience considering that EPD Chief Bolin testified that he was "shocked" by the allegations and, if true, they would constitute serious officer misconduct. [Filing No. 261-25 at 5-6.] For the reasons previously stated in analyzing William and Deadra's false arrest claims, the Court must conclude that EPD Detective Vantlin and KSP Detectives Wise and Jones are not entitled to qualified immunity or summary judgment on William or Deadra's Fifth Amendment due process claim or Fourteenth Amendment substantive due process claim.

### 3) Federal Malicious Prosecution Claim

Plaintiffs assert a federal malicious prosecution claim pursuant to § 1983 on allegations that "Defendants deliberately withheld exculpatory evidence, as well as fabricated false reports

and other evidence, thereby misleading and misdirecting the criminal prosecution."[12]   [Filing No. 1 at 22-23.]  Plaintiffs allege that this behavior affected their constitutional right to a fair trial in violation of the Fifth and Fourteenth Amendments to the United States Constitution.  [Filing No. 1 at 23.]  Defendants concede that the fabrication of evidence may support a federal malicious prosecution claim, [Filing No. 258 at 26], but they argue that some of them are entitled to summary judgment because of a lack of personal involvement and that the rest are entitled to summary judgment because there is no evidence that they knew the evidence was false or that it had any effect on Plaintiffs' prosecutions, [Filing No. 258 at 20-21; Filing No. 258 at 26-28].

The Seventh Circuit has "held that a federal claim for malicious prosecution is actionable only if the state fails to provide an adequate alternative, whether called a claim of malicious prosecution or something else."  *Julian v. Hanna*, 732 F.3d 842, 845 (7th Cir. 2013) (holding that because the Indiana Tort Claims Act grants absolute immunity to state law enforcement officers, Indiana "deprives plaintiffs who assert due process claims against state officers of an adequate alternative remedy to a federal suit.").  In response to Defendants' Motion for Judgment on the Pleadings, the Court previously found that Plaintiffs could proceed with their federal malicious

---

[12] The Court agrees with Defendants that the allegedly coerced confessions are not "fabricated evidence" that could support such an allegation.  *See Avery v. City of Milwaukee*, 847 F.3d 433, 439 (7th Cir. 2017) (emphasizing that while coercively interrogating a witness "may be deplorable," the resulting confession is not "falsified evidence" because it "may turn out to be true").  Moreover, the due process right to a fair trial "isn't implicated absent a violation of the *Brady* duty to disclose facts about the coercive tactics used to obtain it." *Id.*  The Court also agrees with Defendants that Plaintiffs cannot successfully pursue a due process claim regarding the interrogations related to an alleged *Brady* violation because Plaintiffs knew what occurred during their interrogations and there are video recordings of the full interrogations.  [Filing No. 258 at 38]; *see Sornberger*, 434 F.3d at 1029 ("Here, Teresa complains that Officers Sheppard and Riley failed to disclose the circumstances of her interrogation.  However, Teresa already was quite familiar with those circumstances.  Teresa knew herself what occurred during the interrogation, and the police were under no *Brady* obligation to tell her again that they coerced her into confessing.").  In analyzing Plaintiffs' malicious prosecution claim, the Court will focus solely on the allegedly fabricated evidence Plaintiffs point to as support for that claim.

prosecution claim based on Seventh Circuit precedent interpreting Indiana law. [Filing No. 112 at 12-15.] Defendants do not challenge this conclusion on summary judgment, and the Court will not readdress it.

A federal malicious prosecution claim "borrows the elements of the state tort." *Katz-Crank v. Haskett*, 843 F.3d 641, 649 (7th Cir. 2016). "The law of malicious prosecution in Indiana requires the plaintiff to prove the following elements: (1) the defendant instituted or caused to be instituted an action against the plaintiff; (2) the defendant acted with malice and (3) without probable cause; and (4) the action was terminated in the plaintiff's favor." *Id.* "Malicious prosecution is not by itself an infringement on the constitutional right to due process under the Fourteenth Amendment." *Welton v. Anderson*, 770 F.3d 670, 674 (7th Cir. 2014). Instead, it must also be based on a separate deprivation of a constitutional right. *Id.* This is because "there is no such thing as a constitutional right not to be prosecuted without probable cause." *Serino v. Hensley*, 735 F.3d 588, 593 (7th Cir. 2013).

To support a § 1983 malicious prosecution claim, a plaintiff must prove "a violation of a particular constitutional right, such as the right to be free from unlawful seizures under the Fourth Amendment, or the right to a fair trial under the Due Process Clause." *Howlett v. Hack*, 794 F.3d 721, 727-28 (7th Cir. 2015). The Seventh Circuit has "consistently held that a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of [his] liberty in some way." *Avery*, 847 F.3d at 439; *see also Saunders-El v. Rohde*, 778 F.3d 556, 560 (7th Cir. 2015) ("In *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012), we expressly stated that 'a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of [his] liberty in some way.'"). While the need to appear in court or attend trial does

36

not constitute a liberty violation, incarceration pending trial does.  *See Cairel*, 821 F.3d at 831;

*Saunders-El*, 778 F.3d at 560-61 ("'the alleged liberty deprivation came not from the initial arrest,

but from the time spent in confinement after arrest'") (quoting *Alexander v. McKinney*, 692 F.3d

553, 557 (7th Cir. 2012)).

Plaintiffs identify four pieces of allegedly fabricated evidence to support their malicious

prosecution claim.  [Filing No. 267 at 39.]  They are as follows:

- A police report by EPD Detective Spencer dated July 2, 2012, stating that he took William to the Dress Plaza early on June 29, 2012 and that William directed him to the ramp where Marcus' body was dumped.  [Filing No. 256-10 at 38.]  William attests that he never went to the Dress Plaza on June 29, 2012.  [Filing No. 261-31.]

- EPD Detective Vantlin's police report indicating that on July 6, 2012, he met with Sarah Richter, a clerk at the Kangaroo Express who worked the night of June 17, 2012.  [Filing No. 254-1 at 14.]  EPD Detective Vantlin's report states that Ms. Richter told him that she "remembered some kids, possibly 4, come into the store between 2 AM and 4 AM.  They bought about $30.00 worth of candy and soda and used a debit card to pay for the items."  [Filing No. 254-1 at 14.]  In a declaration dated August 18, 2015, Ms. Richter attests that when she spoke with EPD Detective Vantlin "I told him that I do not remember any kids coming into the store during those hours."  [Filing No. 261-33.]

- A police report by EPD Officer J. Dickinson on July 26, 2012, stating that at EPD Detective Vantlin's direction, he showed Ms. Richter four photo arrays and that she was 60-70% sure she recognized Harley, 100% sure she recognized Andrea, and 80% sure she recognized Deadra.  [Filing No. 254-1 at 21-22.]  In a declaration dated August 18, 2015, Ms. Richter attests that she told police that some of the people in the photographs looked familiar but that she did not know if it was because she recognized them from seeing them on TV.  [Filing No. 261-33.]  That information is not in the police report.  [Filing No. 254-1 at 21-22.]

- A pretrial conference in William's criminal case was held on February 14, 2013, and EPD Detectives Pagett and Arbaugh stated that while transporting William to jail following his confession on June 28, 2012, William told them, "It's fine, I have to pay for what I did," and asked "[d]o you think they will just give me a year in jail for this?"  [Filing No. 254-22.]  EPD Detectives Pagett and Arbaugh made a supplemental police report

with that information, [Filing No. 254-22], but William denies ever making those statements, [Filing No. 254-25 at 34].

As an initial matter, the Court agrees with Defendants that because Plaintiffs' malicious prosecution claims are rooted in § 1983 and that statute requires a defendant's personal involvement, Plaintiffs cannot succeed against any Defendants other than the officers specifically involved with the allegedly fabricated evidence—EPD Officers Vantlin, Pagett, Arbaugh, and Spencer.[13] The Court will enter summary judgment in favor of the KSP Defendants on Plaintiffs' federal malicious prosecution claim. The Court also agrees with Defendants that because Plaintiffs have not identified any allegedly fabricated evidence related to Andrea and she was never formally charged or imprisoned, EPD Detective Vantlin is also entitled to summary judgment on Andrea's federal malicious prosecution claim.

After those rulings, the only federal malicious prosecution claims that remain are those that William and Deadra bring against EPD Defendants Vantlin, Spencer, Arbaugh, and Pagett for allegedly fabricating the cited evidence. The Court rejects the EPD Defendants' argument that these claims cannot proceed because there is allegedly no evidence that the officers involved had malice or knew that the evidence was false. [Filing No. 258 at 26-27.] To the contrary, William and Deadra cite ample evidence to establish a genuine issue of material fact regarding the officers' knowledge and intent:

| Issue of Material Fact | Evidence Plaintiffs Cite for their Conclusion | Evidence Defendants Cite for their Conclusion |
|---|---|---|
| Whether Officers had Malice | Officers Had Malice<br>- EPD Detective Spencer allegedly fabricated police report of trip to Dress Plaza with William on June 29, 2012, where William allegedly showed him where Marcus' body | Officers Did Not Have Malice<br>- Defendants deny fabricating any evidence or having agreement to implicate Plaintiffs<br>- Defendants claim no motive to do so |

---

[13] Officer J. Dickinson has never been a Defendant in this action. [Filing No. 1.]

|  | was dumped.  William denies this trip happened.<br>- EPD Detective Vantlin allegedly fabricated police report of Kangaroo Express clerk recalling four teens being at store and using debt card night of June 17, 2012.  Plaintiffs cite affidavit from clerk stating that she told police she did not remember any kids coming into the store during those hours.<br>- EPD Officer Dickinson allegedly fabricated police report of Kangaroo Express clerk identifying some of the Plaintiffs in a photo array.  Plaintiffs cite affidavit from clerk stating that while she told him some looked familiar, she didn't know if it was from seeing them on TV.<br>- EPD Detectives Arbaugh and Pagett allegedly fabricated police report seven months after they say William made inculpatory statements in police car, which he denies.<br>- Lack of physical evidence to corroborate alleged story of crime—no evidence Marcus' debit card used, no evidence of Plaintiffs in Kangaroo Express or where body allegedly dumped, and no evidence of motive |  |
|---|---|---|

The Court must credit William and Deadra's evidence in ruling on summary judgment and, if it is true that all of that evidence was fabricated, it would be reasonable for a jury to conclude that the Defendants involved acted with malice.  *See Sornberger*, 434 F.3d at 1017-18 (reversing district court for resolving factual issue in favor of non-movant on summary judgment and emphasizing that inferences must be resolved in favor of non-movant).

The Court also rejects the EPD Defendants' argument that they are entitled to summary judgment because the allegedly fabricated evidence did not have any effect on the prosecutions of William and Deadra.  [Filing No. 258 at 26-27.]  The Seventh Circuit recently confirmed that it has "consistently held that a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of [his] liberty *in some way*."  *Avery*, 847 F.3d at 439 (emphasis added).  It is undisputed that William was incarcerated for eight months after his arrest and that Deadra was incarcerated for four months following her arrest.  [Filing No. 254-12; Filing No. 254-16.]  While the identified evidence was not relied on in the probable cause affidavit, the Court cannot find as a matter of law that it was not used to support the continued incarceration of William and Deadra on the pending charges. Because there "is no disputing that such conduct [fabricating evidence] violates clearly established constitutional rights," the EPD Defendants are not entitled to qualified immunity or summary judgment.  *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012) (citing *Dominguez v. Hendley*, 545 F.3d 585, 589 (7th Cir. 2008)).  The Court denies the request for summary judgment on William and Deadra's federal malicious prosecution claim against EPD Detectives Vantlin, Pagett, Arbaugh, and Spencer.

### 4) § 1983 Claims for Failure to Intervene and Conspiracy

Plaintiffs assert federal claims for conspiracy and failure to intervene against the EPD Defendants and the KSP Defendants.  For both claims, the EPD Defendants and the KSP Defendants argue that there is no underlying constitutional violation and that any conclusions in favor of these claims are based on mere speculation.  [Filing No. 257 at 41-43; Filing No. 258 at 38-40.]  Because these federal claims are related, the Court will address them together.

To succeed on a failure to intervene claim or on a conspiracy claim, there must be an underlying denial of constitutional rights. *Gill*, --- F.3d ---, 2017 WL 897344, at *4.  For a failure to intervene claim, a plaintiff must demonstrate that the defendants knew that a constitutional violation was committed and had a realistic opportunity to prevent it. *Id.*  Specifically, "[a]n officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know: (1) that excessive force was being used, (2) *that a citizen has been unjustifiably arrested*, or (3) that any constitutional violation has been committed by a law enforcement official; and the officer had a realistic opportunity to intervene to prevent the harm from occurring." *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994 (emphasis added).  For a conspiracy claim, a plaintiff must show "an agreement between the officers to inflict injury or harm on [plaintiff]." *Akbar v. Calumet City*, 632 F. App'x 868, 872 (7th Cir. 2015) (citing *Sow v. Fortville Police Dep't*, 636 F.3d 293, 304-05 (7th Cir. 2011)).  "Although an agreement may be inferred from circumstantial evidence, any such inference must be based on more than speculation or conjecture." *Akbar*, 632 F. App'x at 872 (citing *Sow*, 636 F.3d at 305).  That said, "a pattern of harassment by several officers over a period of months" is sufficient because it would be "a challenge to imagine a scenario in which that harassment would not have been the product of a conspiracy." *Geinosky v. City of Chicago*, 675 F.3d 743, 749 (7th Cir. 2012).

The EPD Defendants and the KSP Defendants ask for summary judgment in their favor on Plaintiffs' failure to intervene and conspiracy claims.  [Filing No. 257 at 41-43; Filing No. 258 at 38-40.]  They argue that because there are no underlying constitutional violations, these claims must fail as a matter of law.  [Filing No. 257 at 41-43; Filing No. 258 at 38-40.]  The Court has already found that it cannot conclude that there are no underlying constitutional violations as a

matter of law because of the disputed issues of material fact previously detailed.  The Court rejects Defendants' request for summary judgment on the failure to intervene and conspiracy claims on that basis.

The EPD Defendants and the KSP Defendants also argue that there is no evidence that they had a reasonable opportunity to intervene to prevent underlying constitutional violations or that they had any agreement to inflict injuries on the Plaintiffs, such that there was a conspiracy.  [Filing No. 257 at 41-43; Filing No. 258 at 38-40.]  But Plaintiffs' theory of the case is that the Defendants erroneously focused on them as suspects in their uncle's death, which may have been a suicide, and then used unconstitutional means to build their case over the course of months by coercing Plaintiffs' confessions and fabricating evidence to support their theory that the death was a murder and that Plaintiffs were involved.  The Court has extensively detailed the evidence Plaintiffs cite in support of their theory, and that evidence must carry the day on summary judgment.  The Court finds that a reasonable jury could conclude that the EPD Defendants and the KSP Defendants had an agreement to build a case against Plaintiffs in the death of their uncle by coercing their confessions and fabricating evidence, and that none of them intervened to stop.  At this stage of the proceedings, Defendants' request for summary judgment on the failure to intervene and civil conspiracy claims must be denied.

*5) Monell Claim against City of Evansville Based on Interrogations*

Plaintiffs assert a *Monell* claim against the City, but they clarify in their response brief that the *Monell* claim is based on their theory that the "City of Evansville may be directly liable under § 1983 for constitutional violations caused by the 'failure to supervise' the interrogation practices of Evansville police officers."  [Filing No. 267 at 54.]  They contend that a jury must decide the *Monell* claim "[b]ecause no coherent system of supervision exists to ensure that EPD detectives

do not use coercion to elicit false confessions, [and] Detective Vantlin was able to elicit a false confession from Plaintiffs, causing constitutional injuries." [Filing No. 267 at 55.]  The City disagrees, contending that Plaintiffs fail to present any evidence of a widespread practice and emphasizing that Plaintiffs "do not have any evidence of any other individuals who suffered a constitutional injury as the result of the City's alleged failure to supervise interrogations." [Filing No. 278 at 24.]

Municipalities are susceptible to liability under § 1983, but they cannot be held liable under a theory of *respondeat superior*. *Palmer v. Marion Cty.*, 327 F.3d 588, 594 (7th Cir. 2003) (citing *Monell v. Dept. of Soc. Servs. of the City of New York*, 436 U.S. 658, 691 (1978)).  The "critical question" under *Monell* is whether a municipal policy or custom caused the harm or if, instead, the harm resulted from acts of the entity's agents. *Glisson v. Indiana Dep't of Corr.*, --- F.3d ---, 2017 WL 680350, at *5 (7th Cir. 2017) (en banc).  "'A person who wants to impose liability on a municipality for a constitutional tort must show that the tort was committed (that is, authorized or directed) at the policymaking level of government.'" *Id.* (quoting *Vodak v. City of Chicago*, 639 F.3d 738, 747 (7th Cir. 2011)).  "Either the content of an official policy, a decision by a final decisionmaker, or evidence of custom will suffice." *Glisson*, 2017 WL 680350, at *5.

To establish liability based on the City's alleged failure to supervise its interrogating officers, a plaintiff must show "deliberate indifference" on the part of the City. *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010).  "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citation omitted). When City policymakers are on actual or constructive notice that their persistent failure to

43

supervise subordinates will cause constitutional violations, the City may be deemed deliberately indifferent to the consequences of its inaction.  *Id.*

"*Monell* claims based on allegations of an unconstitutional municipal practice or custom—as distinct from an official policy—normally require evidence that the identified practice or custom caused multiple injuries." *Chatham v. Davis*, 839 F.3d 679, 685 (7th Cir. 2016) (citing *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) ("[T]here is no clear consensus as to how frequently [an injury] must occur to impose *Monell* liability, except that it must be more than one ... or even three [times]."); *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005) (stating that a custom or practice claim "requires more evidence than a single incident to establish liability")).

The City correctly points out that Plaintiffs do not designate any evidence that the City authorized its officers to conduct coercive interrogations through policy or custom.  *See Bloodworth v. Vill. of Greendale*, 475 F. App'x 92, 95 (7th Cir. 2012) (granting summary judgment in favor of municipal entities after noting that plaintiff "presented no evidence showing that either the Village or the County had authorized their employees, through official policy or custom, to . . . conduct custodial interrogations").  In fact, EPD Chief Bolin testified that if Plaintiffs' allegations regarding EPD Detective Vantlin's interrogation tactics are true, Detective Vantlin violated EPD policy that "states unequivocally that no form of coercion or promise of reward will be used to obtain a confession or admission of guilt."  [Filing No. 261-25 at 6-9.]  Plaintiffs also have not designated any evidence of other allegedly coercive interrogations conducted by EPD Detective Vantlin or other City officers.  Accordingly, Plaintiffs do not present any evidence that City policymakers were on actual or constructive notice that their persistent failure to supervise subordinates would cause constitutional violations, such that there was deliberate indifference.

44

For these reasons, the Court concludes that the City is entitled to summary judgment on Plaintiff's *Monell* claim as a matter of law.

### E.  Plaintiffs' State Law Claims against the EPD Defendants and the City

Plaintiffs assert state law claims for false arrest and false imprisonment against the EPD Defendants and the City.  [Filing No. 120; Filing No. 225.]  They also assert state law claims for indemnification and *respondeat superior* against the City.  [Filing No. 120; Filing No. 225.]  The EPD Defendants and the City move for summary judgment on all of these claims, arguing that various Plaintiffs failed to provide timely notice of their state law claims pursuant to the Indiana Tort Claims Act, that the EPD Defendants are not subject to individual liability, and that Plaintiffs' claims for *respondeat superior* and indemnification against the City fail as a matter of law.  [Filing No. 258 at 46-49.]  Plaintiffs do not respond to any of these arguments in their response brief.  [Filing No. 267 (focusing exclusively on responding to the federal claims).]  Any responsive argument is waived, and the Court agrees with the EPD Defendants and the City that they are entitled to summary judgment in their favor on Plaintiffs' state law claims.

### F.  Plaintiffs' State Law Claims against the KSP Defendants[14]

Plaintiffs assert state law claims for false arrest, malicious prosecution, intentional infliction of emotional distress, and defamation against the KSP Defendants.  [Filing No. 120; Filing No. 225.]  The KSP Defendants move for summary judgment on these claims, arguing that qualified immunity under Kentucky state law applies and that, if it does not, Plaintiffs' state law claims fail for various reasons as a matter of law.  [Filing No. 257 at 45-49.]  In response, Plaintiffs

---

[14] The KSP Defendants raise the timeliness of Plaintiffs' tort claim notices for the first time in their reply brief on summary judgment.  [Filing No. 273 at 18-19.]  Arguments raised for the first time in a reply brief are waived, *Mendez v. Perla Dental*, 646 F.3d 420, 423-24 (7th Cir. 2011), and the Court will not address the timeliness issue further.

do not address the Kentucky qualified immunity argument and only challenge the merits of the KSP Defendants' arguments with regard to the intentional infliction of emotional distress and defamation claims.   [Filing No. 268 at 52.]   Plaintiffs have waived any responsive arguments regarding qualified immunity under Kentucky state law, as well as any responsive arguments to the false arrest and malicious prosecution claims.   While Plaintiffs do address the merits of their intentional infliction of emotional distress and defamation claims against the KSP Defendants, the Court finds their failure to address the Kentucky qualified immunity argument dispositive.   The Court grants summary judgment in favor of the KSP Defendants on Plaintiffs' state law claims for false arrest, malicious prosecution, intentional infliction of emotional distress, and defamation.

## IV.
### CONCLUSION

For the reasons stated herein, the Court **GRANTS** Dr. Burrows-Beckham's Motion for Summary Judgment and enters summary judgment in her favor on all of Plaintiffs' claims against her. [Filing No. 255.]

The Court **GRANTS IN PART AND DENIES IN PART** the EPD Defendants' Motion for Summary Judgment. [Filing No. 254.] Specifically, the Court **GRANTS** the EPD Defendants' request for summary judgment in favor of Sergeant Larry Nelson because Plaintiffs do not oppose that request in their response brief. [*See* Filing No. 267 at 20.] It also **GRANTS** their request for summary judgment on the following claims: Plaintiffs' § 1983 false arrest claim against EPD Detectives Arbaugh, Pagett, and Spencer; Plaintiffs' § 1983 due process and substantive due process claims against EPD Detectives Arbaugh, Pagett, and Spencer based on the allegedly coerced confessions; Andrea's § 1983 due process and substantive due process claims against EPD Detective Vantlin; Andrea's federal malicious prosecution claims based on allegedly fabricated

evidence against the EPD Defendants; Plaintiffs' *Monell* claim against the City; and Plaintiffs' state law claims against the EPD Defendants and the City.

The Court will keep the EPD Defendants' request to strike the testimony of Plaintiffs' expert Steven A. Drizin pursuant to Federal Rule of Evidence 702 **UNDER ADVISEMENT**, [Filing No. 278 at 3-6], to be addressed in conjunction with the KSP Defendants' pending motion to exclude Mr. Drizin's testimony, [Filing No. 284].[15]

The Court **GRANTS IN PART AND DENIES IN PART** the KSP Defendants' Motion for Summary Judgment.  [Filing No. 256.]  The Court **GRANTS** summary judgment in favor of the KSP Defendants on Plaintiffs' federal malicious prosecution claim, as well as Plaintiffs' state law claims for false arrest, malicious prosecution, intentional infliction of emotional distress, and defamation.

The Court **DENIES** the EPD and KSP Defendants' requests for summary judgment on the following claims, which will proceed to a jury trial scheduled to begin on **September 6, 2017**:

- William, Deadra, and Andrea's false arrest claims pursuant to § 1983 against EPD Detective Vantlin and KSP Detectives Wise and Jones;

- William and Deadra's Fifth Amendment due process claims and Fourteenth Amendment substantive due process claims against EPD Detective Vantlin and KSP Detectives Wise and Jones based on the allegedly coerced confessions;

- William and Deadra's federal malicious prosecution claims against EPD Detectives Vantlin, Pagett, Arbaugh, and Spencer based on allegedly fabricated evidence;

---

[15] The Clerk may still terminate Filing No. 254 because the Court has ruled on the summary judgment request pending therein.

- Plaintiffs' failure to intervene claim pursuant to § 1983 against the EPD Defendants and the KSP Defendants; and

- Plaintiffs' conspiracy claim pursuant to § 1983 against the EPD Defendants and the KSP Defendants;

Although Plaintiff Debbie Hurt has not been dismissed from this case, it does not appear that Plaintiffs are pursuing any claims on her behalf, [Filing No. 120; Filing No. 225], and the parties do not reference any claims by Debbie in the extensive summary judgment briefing. The Court **ORDERS** Plaintiffs to **SHOW CAUSE** by **March 31, 2017** why Debbie should not be terminated as a party to this litigation on the Court's docket.

No partial final judgment shall issue at this time.

Date:  March 16, 2017

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Electronic Distribution to Counsel of Record only via CM/ECF**

48