UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

WILLIAM HURT, DEADRA HURT, and ANDREA HURT,          )
      *Plaintiffs*,         )
               )     3:14-cv-00092-JMS-MPB
      *vs.*         )
               )
JEFF VANTLIN, JACK SPENCER, WILLIAM ARBAUGH, JASON PAGETT, MATTHEW WISE, and ZACHARY JONES,     )
      *Defendants*.       )

## ORDER

Plaintiffs William Hurt, Deadra Hurt, and Andrea Hurt[1] allege in this matter that they were wrongfully targeted, arrested, and prosecuted for the death of their uncle, Marcus Golike, whose body was found in the Ohio River in June 2012. After the Court ruled on Motions for Summary Judgment filed by Defendants Evansville Police Department Detectives Jeff Vantlin, Jack Spencer, William Arbaugh, and Jason Pagett (the "EPD Defendants") and Kentucky State Police Detectives Matthew Wise and Zachary Jones (the "KSP Defendants"), the Defendants sought and the Seventh Circuit resolved an interlocutory appeal. Following remand, the Court considered briefing by the parties on the effect of the Court's summary judgment rulings and the interlocutory appeal, and determined that the following claims remain for trial: (1) Wrongful Pretrial Detention: William vs. EPD Detectives Vantlin, Spencer, Arbaugh, and Pagett; Deadra vs. EPD Detectives Vantlin and Spencer; (2) False Arrest: William, Deadra, and Andrea vs. EPD Detective Vantlin and KSP Detectives Wise and Jones; (3) Use of an Involuntary Confession in a Criminal Proceeding: William and Deadra vs. EPD Detective Vantlin and KSP Detectives Wise and Jones; (4) Failure

---

[1] For simplicity, the Court will refer individually to Plaintiffs by their first names only in the remainder of this Order.

to Intervene in Constitutional Violations: William, Deadra, and Andrea vs. EPD Detectives Vantlin, Spencer, Arbaugh, and Pagett, and KSP Detectives Wise and Jones; and (5) Conspiracy to Deprive Constitutional Rights: William, Deadra, and Andrea vs. EPD Detectives Vantlin, Spencer, Arbaugh, and Pagett, and KSP Detectives Wise and Jones.  [Filing No. 435.]

Trial in this matter is set for April 20, 2020.  Presently pending before the Court are the following motions related to the parties' expert witnesses: (1) the KSP Defendants' Motion to Exclude Plaintiffs' Expert Steven Drizin, [Filing No. 284]; (2) the EPD Defendants' Motion to Exclude Anticipated Testimony of Plaintiffs' Experts, [Filing No. 286]; (3) Plaintiffs' Motion to Exclude Certain Purported Expert Opinions of William Gaut, [Filing No. 289]; and (4) Plaintiffs' Motion to Exclude the Purported Expert Opinions of David Shraberg, [Filing No. 291].  These motions[2] are now ripe for the Court's review.

# I.
## APPLICABLE LAW

Federal Rule of Evidence 104 instructs that "[t]he court must decide any preliminary question about whether a witness is qualified…or evidence is admissible."  Fed. R. Evid. 104(a). Federal Rule of Evidence 702 provides that expert testimony is admissible if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.  A trial judge "must

---

[2] The Court notes the irony of the parties' competing motions.  They each raise objections to the other's experts relating to, for example, testimony as to legal conclusions and state of mind, yet argue that their own experts should be permitted to testify in violation of the very principles they rely upon.  As the Court sets forth below, what's good for the goose is good for the gander, and competing expert witnesses are bound by the same parameters.

determine at the outset…whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.  This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue…. Many factors will bear on the inquiry…."  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93 (1993).

The Court has a "gatekeeping obligation" under Rule 702, and "must engage in a three-step analysis before admitting expert testimony.  It must determine whether the witness is qualified; whether the expert's methodology is scientifically reliable; and whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'"  *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017) (quoting *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010)).  Put another way, the district court must evaluate: "(1) the proffered expert's qualifications; (2) the reliability of the expert's methodology; and (3) the relevance of the expert's testimony."  *Gopalratnam*, 877 F.3d at 779 (emphasis omitted).  The Seventh Circuit Court of Appeals "give[s] the district court wide latitude in performing its gate-keeping function and determining both how to measure the reliability of expert testimony and whether the testimony itself is reliable."  *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011).

## II.
### DISCUSSION

The Court notes at the outset that the parties have filed over 275 pages in briefs and over 1,700 pages of exhibits in connection with the four pending motions.  The Court has done its best to sift through this voluminous material and provide clear and succinct rulings on the motions. The Court will not, however, engage in a line-by-line review of the expert reports in order to address their admissibility.  Rather, the Court has endeavored to rule on the categories of testimony

to which the parties object. It will be counsel's responsibility to prepare their witnesses to testify within the contours of these rulings.

Because there is some overlap among the various motions, the Court addresses each expert whose testimony is the subject of motions in turn.

### A. Steven Drizin

#### 1. *Summary of Report*

Steven Drizin has been retained as an expert by Plaintiffs. He is a professor at Northwestern University School of Law, is currently the Assistant Dean of Northwestern's Bluhm Legal Clinic, and was formerly the Legal Director of Northwestern's Center on Wrongful Convictions. [Filing No. 284-1 at 1.] While at the Center on Wrongful Convictions, Professor Drizin founded the Center on Wrongful Convictions of Youth, which was the first organization in the country dedicated to rectifying the wrongful convictions of children and adolescents. [Filing No. 284-2 at 1.] Currently, Professor Drizin's focus at Northwestern University School of Law is "centered on the circumstances under which police interrogation tactics are likely to produce false confessions." [Filing No. 284-2 at 2.]

In his report, Professor Drizin first provides information regarding the phenomenon of false confessions, and discusses the social psychology of police interrogations, age as a risk factor for false confessions, and the three errors common in false confession cases (misclassification, coercion, and contamination). [Filing No. 284-2 at 6-16.] He then discusses how to differentiate between reliable and unreliable confessions, and discusses the interrogations of William, Deadra, and Andrea. [Filing No. 284-2 at 16-39.] As for the interrogation of William, Professor Drizin recaps interviews conducted by Detectives Vantlin and Jones, and certain actions taken by the detectives after the interviews. [Filing No. 284-2 at 18-21.] In his report, Professor Drizin opines

regarding the types of interrogation tactics used, and whether William's responses should have led the investigators to believe that he was responsible for Mr. Golike's death. [Filing No. 284-2 at 18-21.] He then details several aspects of William's interrogation, broken into two time periods: pre- and post-break. [Filing No. 284-2 at 21-30.] Professor Drizin concludes that William's confession was the product of psychologically coercive interrogation tactics and extensive, improper police contamination, and also that the substance of his confession is unbelievable. [Filing No. 284-2 at 21-33.] As to Deadra's confession, Professor Drizin recaps her interrogation and opines that her confession was the product of extreme psychological coercion and extensive contamination. [Filing No. 284-2 at 34-36.] Professor Drizin then notes that while Andrea's interrogation did not result in a confession, she did make some inculpatory statements which she recanted despite efforts to coerce her into giving a confession that matched William's and to feed her facts. [Filing No. 284-2 at 36-39.]

Professor Drizin draws the following conclusions:

- "The youth of William, Deadra, and Andrea, and their inexperience with the police made them ill-prepared to deal with the extremely high-stakes, high-pressure interrogations they were subjected to in connection with the death of their uncle";

- The detectives who conducted the interrogations relied on body language cues and the use of behavior-provoking questions, both of which are unreliable. They then "launched into a highly confrontational interrogation technique that aimed to reduce the Hurts to a place of hopelessness by interrupting their denials, refusing to accept their assertions of innocence, using false evidence ploys, and then giving them an out – a face-saving justification for confessing to the crime….";

- The detectives ignored clear signs of innocence and distorted Plaintiffs' answers to support their theory that Plaintiffs were guilty. They used implied promises, direct threats, and promises of leniency, and continually threatened Plaintiffs, which are all strategies likely to cause an innocent person to confess to a crime they did not commit;

- After the detectives obtained admissions from William and Deadra, they fed facts to them, some of which came from their investigation and some of which were part of their theory of what happened;

- The interrogations of all three Plaintiffs indicate that Plaintiffs were trying to put together clues and tell the story that was told to them by detectives. When they were not fed details, their accounts were error-filled, inconsistent, and could not be corroborated; and

- William and Deadra's confessions were uncorroborated by any physical or forensic evidence.

[Filing No. 284-2 at 39-40.]

### 2. *Defendants' Motions to Exclude*

In their Motion to Exclude, the KSP Defendants argue that Professor Drizin is not qualified to express opinions critical of police practices because he has no education or experience in police work. [Filing No. 285 at 8-9.] They note that he considers himself an expert in police interrogations and confessions, but concedes he is not an expert in police detective work. [Filing No. 285 at 8-9.] The KSP Defendants argue that due to this lack of experience, Professor Drizin should not be permitted to provide opinions that are critical of Defendants' "skills, techniques and practices" by testifying that Defendants "fed the Hurts facts, made promises of leniency, were verbally threatening, etc., all of which induced…William and Deadra Hurt to confess falsely." [Filing No. 285 at 9.] The KSP Defendants argue that Professor Drizin's testimony will not be helpful to the jury and invades their province, noting that the interrogations were videotaped and the jury can watch the interrogations and decide for themselves if the police action was reasonable. [Filing No. 285 at 11-13.] The KSP Defendants also contend that Professor Drizin's testimony is cumulative, and that Plaintiffs' other expert witness, Dennis Waller, is a former police officer and will testify regarding much of the same information Professor Drizin would address. [Filing No. 285 at 14-15.] The KSP Defendants assert that Professor Drizin's opinions do not pass muster

under *Daubert* because his methods (*e.g.*, "simply compar[ing] the police action he reviews to other cases he has studied or read about, and then…mak[ing] a subjective determination as to whether it is reasonable") are unreliable, cannot be tested, have not been subjected to peer review, do not have a rate of error, and are not generally accepted. [Filing No. 285 at 15-25.] Finally, the KSP Defendants argue that Professor Drizin's opinions should be excluded because they are unfairly prejudicial. [Filing No. 285 at 25-26.]

The EPD Defendants also move to exclude Professor Drizin's testimony, echoing many of the KSP Defendants' arguments including that Professor Drizin cannot conclusively state whether the confessions were false, that his testimony will not assist the jury, that his testimony is not based on sufficient facts or data and reliable principles and methods, and that the testimony is unfairly prejudicial, confusing, and likely to mislead the jury. [Filing No. 287 at 21-29.]

In response to both the KSP Defendants' and EPD Defendants' motions, Plaintiffs argue that Professor Drizin is qualified to testify as an expert in false confessions, as he "has been a leader in the field of false confessions research for over 15 years," and "has amassed the largest database of proven false confessions in the country." [Filing No. 308 at 5.] They argue that they are not offering Professor Drizin as a policy practices expert, but as a false confessions expert, and distinguish him from experts offered in cases relied upon by Defendants. [Filing No. 308 at 8-10.] Plaintiffs contend that Professor Drizin's testimony will aid the jury, and that the utility of false confessions research has been recognized by the Supreme Court of the United States, the Seventh Circuit Court of Appeals, and district courts within the Seventh Circuit. [Filing No. 308 at 10-13.] They note that simply watching the videotaped confessions does not substitute for Professor Drizin's testimony, and that his testimony "is not being offered to tell the jury what happened during the interrogations; rather, he will analyze what the jury sees in the videos and break down

the various tactics and phases of the interrogations to explain why the confessions are not reliable." [Filing No. 308 at 13-14.] Plaintiffs assert that Professor Drizin's methodology satisfies *Daubert*, is widely accepted in his field, does not rest on assumptions that a confession is false, is not problematic simply because coercive tactics sometimes yield truthful confessions, and is not flawed simply because he did not meet with Plaintiffs. [Filing No. 308 at 14-21.] Plaintiffs argue that Professor Drizin need not opine on whether Plaintiffs' confessions were false, and that neither a jury instruction nor the testimony of Dennis Waller would be an appropriate substitute for Professor Drizin's testimony. [Filing No. 308 at 25-26.] Finally, Plaintiffs argue that Defendants can address their concerns through cross-examination. [Filing No. 308 at 27.]

In their replies, the KSP Defendants and the EDP Defendants reiterate many of their arguments and attempt to distinguish cases relied upon by Plaintiffs. [Filing No. 311; Filing No. 312 at 11-20.]

### a.  Whether Professor Drizin is Qualified

Fed. R. Evid. 702 allows the opinions of witnesses who have the requisite "knowledge, skill, experience, training, or education."  The Court finds that Professor Drizin is qualified to testify as an expert in false confessions.  He served as the Legal Director of the Center on Wrongful Convictions at Northwestern University School of Law from 2005 to 2013, and then became Assistant Dean of the Bluhm Legal Clinic at Northwestern. [Filing No. 284-1 at 1.] He also was the Supervising Attorney at Northwestern University School of Law's Children and Family Justice Center, where he dealt with issues relating to juvenile interrogations and confessions. [Filing No. 284-2 at 1.] In 2008, Professor Drizin founded the country's first Center on Wrongful Convictions of Youth, which is "exclusively dedicated to rectifying the wrongful convictions of children and adolescents." [Filing No. 284-2 at 1.] While at Northwestern University School of Law, Professor

Drizin has focused on "the circumstances under which police interrogation tactics are likely to produce false confessions." [Filing No. 284-2 at 2.] He has written and published numerous articles on the subject. [Filing No. 284-2 at 2.] Additionally, he and his students have collected and analyzed false confessions from around the country. [Filing No. 284-2 at 2.]

The Court rejects the KSP Defendants' argument that Professor Drizin is not qualified because he has no experience or education in "police work." [Filing No. 285 at 8.] Plaintiffs do not offer Professor Drizin as an expert on police practices, or whether Defendants met some applicable standard of practice while interrogating Plaintiffs. [*See* Filing No. 308 at 8 (Plaintiffs stating that they "do not offer Professor Drizin as a police practices expert, but as a false confessions expert").] Professor Drizin's work to identify false confessions, his extensive experience in studying and analyzing false confessions, and his authorship of multiple articles on false confessions – often in collaboration with other experts in the field – make him qualified to testify as an expert on false confessions.

### b. Whether Professor Drizin's Methodology is Scientifically Reliable

The Supreme Court in *Daubert* set forth four factors a court may consider when determining whether an expert witness's methodology is reliable, including: (1) whether the methodology "can be (and has been) tested"; (2) whether the methodology "has been subjected to peer review and publication"; (3) the "known or potential rate of error"; and (4) whether the methodology is generally accepted. *Daubert*, 509 U.S. at 593-94. These factors are not a "definitive checklist or test," *id.* at 593, and the weight of the factors is dependent on "the particular circumstances of the particular case at issue," *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999). The key focus "is to make certain that an expert, whether basing testimony upon

professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152.

Defendants take issue with Professor Drizin's methodology in several respects. They argue that his theories and methods cannot be tested, have not been subjected to peer review, do not have a rate of error, and are not generally accepted. [Filing No. 285 at 18-22; Filing No. 287 at 25-27.] However, they rely exclusively on district court cases from outside of the Seventh Circuit which, even assuming they are on point, are not binding on this Court. Conversely, several courts within the Seventh Circuit have found that the field of social psychology, as specifically applied to obtaining coerced confessions, is reliable. *See, e.g.*, *United States v. Hall*, 974 F.Supp. 1198, 1205 (C.D. Ill. 1997) (holding that "the science of social psychology, and specifically the field involving the use of coercion in interrogations, is sufficiently developed in its methods to constitute a reliable body of specialized knowledge under Rule 702").

Indeed, the issues Defendants have with Professor Drizin's methodology have little to no application in the false confessions context, but are more tailored to a scientific expert issue. For example, an error rate would be irrelevant in this context – a confession is either coerced and, in some cases, false, or it is not. Whether other confessions were considered coerced and false under Professor Drizin's methodology has no bearing on whether Plaintiffs' were. As one district court within the Seventh Circuit has recognized, the Supreme Court in *Daubert* was considering "Newtonian experimental science" when it set forth factors relating to methodology. *Hall*, 974 F.Supp. at 1200-01. That court noted that the factors set forth in *Daubert* "have little or no application to nonscientific expert evidence." *Id.* (citing *United States v. Jones*, 107 F.3d 1147, 1157-58 (6th Cir. 1997), *cert. denied*, 521 U.S. 1127 (1997) (application of methodology factors would "turn *Daubert*, a case intended to relax the admissibility requirements for expert scientific

evidence, on its head")).  The Court agrees, and notes that the Seventh Circuit has recognized that "[s]ocial science in general, and psychological evidence in particular, have posed both analytical and practical difficulties for courts attempting to apply Rule 702 and *Daubert*."  *United States v. Hall*, 93 F.3d 1337, 1342 (7th Cir. 1996).

The Court finds that Professor Drizin's methodology – which he sets forth by explaining what factors are present in coerced confessions and then by identifying those factors in the interrogations of William, Deadra, and Andrea – is reliable.  This methodology is based on Professor Drizin's extensive experience studying and observing coerced, and sometimes false, confessions.  *Hall*, 974 F.Supp. at 1205 ("While [the expert witness] and his peers utilize observational, as opposed to experimental, techniques, this is wholly acceptable in the established field of social psychology").  Further, Defendants may address any perceived gaps or shortcomings in Professor Drizin's methodology during cross-examination.  *Daubert*, 509 U.S. at 596 ("Vigorous crossexamination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence"); *see also Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) ("Determinations on admissibility should not supplant the adversarial process; 'shaky' expert testimony may be admissible, assailable by its opponents through cross-examination").

c.  Whether Professor Drizin's Testimony Will Aid the Trier of Fact

Defendants argue that because Plaintiffs' confessions were videotaped, the jury can simply watch them and Professor Drizin's testimony adds nothing new.  It is true that an expert "must testify to something more than what is obvious to the layperson."  *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 871 (7th Cir. 2001) (citation and quotation omitted).  While the jury in this case can watch the interrogations on videotape and draw conclusions based on what they see, a

layperson may not be familiar with the fact that false confessions sometimes occur, the tactics most commonly used to coerce a confession, and how to recognize those tactics – topics which Professor Drizin will cover.  *See Caine v. Burge*, 2013 WL 1966381, *2 (N.D. Ill. 2013) ("Although jurors' common sense may suggest to them that someone would never falsely confess to committing murder, [the expert's] testimony will educate jurors that false confessions sometimes do occur") (emphasis omitted); *Hall*, 974 F.Supp. at 1206 (finding testimony from expert regarding coerced confessions would be helpful to the jury because testimony "challenges [the perception that once a person confesses to his guilt, he must be guilty] based on systematic observation of data to which the jury is not privy").  Moreover, the Seventh Circuit has specifically addressed the use of expert witness testimony regarding coerced confessions, and recognized that such testimony can be helpful to the trier of fact.  *Hall*, 93 F.3d at 1345 ("Even though the jury may have had beliefs about the subject, the question is whether those beliefs were correct.  Properly conducted social science research often shows that commonly held beliefs are in error.  [The expert witness's] testimony, assuming its scientific validity, would have let the jury know that a phenomenon known as false confessions exists, how to recognize it, and how to decide whether it fit the facts of the case being tried"); *see also Hall*, 974 F.Supp. at 1206.

Further, the Court rejects Defendants' arguments that Professor Drizin's testimony is duplicative of Dennis Waller's testimony or that a jury instruction can convey the same information to which Professor Drizin will testify.  Mr. Waller, as discussed below, is offered as an expert on police practices.  Professor Drizin is not.  The fact that they will both testify about the propriety of the interrogations does not make their testimony duplicative – they bring different points of view and different expertise to the table.  And a jury instruction could not sufficiently or

feasibly convey the information that Professor Drizin will provide.  Professor Drizin's testimony will be an aid to the jury in this case.

        d.   <u>Whether Professor Drizin's Testimony is Inadmissible on Other Grounds</u>

Defendants argue that because Professor Drizin has never met Plaintiffs and cannot testify that their confessions were false, his testimony would be unfairly prejudicial.  [Filing No. 285 at 26; Filing No. 287 at 28-29.]  Fed. R. Evid. 403 allows the Court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of…unfair prejudice…."  Defendants have not provided any legal authority, nor has the Court located any, indicating that Professor Drizin would need to have personally met Plaintiffs in order to render an expert opinion in this matter.  Indeed, expert witnesses frequently testify based on their review of discovery in a case, and without first-hand knowledge of the party.  For example, medical experts commonly testify as to their opinion based on a party's medical records, and not based on their actual examination of the party.  Moreover, Professor Drizin's inability to testify that Plaintiffs' confessions were false does not make his testimony unfairly prejudicial.  Again, Defendants can address their concerns through their cross-examination of Professor Drizin.  The Court finds that his testimony is not unfairly prejudicial such that it should not be admitted.

The Court also finds, however, that Professor Drizin may not testify regarding Defendants' states of mind, whether Plaintiffs' confessions were false, and whether Defendants knowingly procured false confessions.  These are the ultimate legal conclusions that must be determined by the jury.  *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003) ("[E]xpert testimony as to legal conclusions that will determine the outcome of the case is inadmissible"); *Client Funding Solutions Corp. v. Crim*, 943 F.Supp.2d 849, 863 (N.D. Ill. 2013) ("Opinions that amount to legal conclusions do not assist the trier of fact"); *Caine*, 2013 WL

1966381 at *3 (expert witness on coerced confessions could testify to "various factors that can cause false confessions, and to their presence in this case," and "that, based on his knowledge, experience, and study of confessions and police interrogation, false confessions frequently do not contain the type of crime scene knowledge that only a true perpetrator would have, and that some false confessions contain such detail because of police contamination," but could not testify as to his opinion that plaintiffs' confessions were false, or a comparison of the witnesses' confessions and the physical evidence).

e.   Conclusion

The Court **GRANTS IN PART** and **DENIES IN PART** the KSP Defendants' Motion to Exclude Plaintiffs' Expert Steven Drizin, [Filing No. 284], and the EPD Defendants' Motion to Exclude Anticipated Testimony of Plaintiffs' Experts, [Filing No. 286], as follows:

- Professor Drizin is a qualified expert on false confessions;

- Professor Drizin's methodology is reliable;

- Professor Drizin's testimony will aid the jury; and

- Although not an exhaustive list, Professor Drizin may testify regarding coercive techniques, the development of the brain of adolescents, what techniques he knows detectives were trained in, ways those techniques were among the coercive types used in the interrogations of Plaintiffs, and ways he believes Defendants contaminated the interrogations.  He may not testify regarding Defendants' states of mind, whether Plaintiffs' confessions were false, and whether Defendants knowingly procured false confessions.

**B. Dennis Waller**

.        *1.   Summary of Report*

Plaintiffs have retained Dennis Waller as an expert.  Mr. Waller has a Bachelor of Science degree in police administration from Michigan State University, and a Master of Science degree in public administration from Florida International University.  [Filing No. 286-1 at 1.]  He has

received over 3,600 hours of law enforcement training and is one of approximately one hundred Certified Legal Investigators in the United States. [Filing No. 286-1 at 1.] Mr. Waller has served as a police officer, field training officer, detective, sergeant, lieutenant, department training officer, and chief, and has been certified as a police trainer in several states. [Filing No. 286-1 at 2.] He has taught various law enforcement and related courses at the college and university levels. [Filing No. 286-1 at 2.] Mr. Waller has served as a consultant/expert witness in more than 650 cases involving issues related to police policy, procedure, and practices, for both plaintiffs and defendants. [Filing No. 286-1 at 1.]

In his report, Mr. Waller sets forth the methodology he uses to "examine police-related issues involved in litigation," which includes: (1) developing an understanding of the facts; (2) analyzing the actions of the officers; (3) comparing what the officers did and why with the standards of training and practice; and (4) defining and explaining consistencies and/or inconsistencies with applicable standards of training and practice. [Filing No. 286-1 at 2-3.] In applying this methodology, Mr. Waller reaches the following conclusions in his report:

- "Although there is a genuine dispute of fact whether a homicide actually occurred, there is no question that the involved police personnel never considered plausible alternatives to homicide in Mr. Golike's death, which on an objective basis should have been considered obvious. This failure to consider alternatives reveals conduct that runs counter to generally accepted police practices";

- "Based on the evidence the detectives had gathered at the time they began William's interrogation, no competent, trained police officer would have believed that William, Deadra, or Andrea Hurt was involved in the death of Marcus Golike. When William failed to provide them with any details indicating his involvement in the death of Mr. Golike, the detectives used improper interrogation techniques, in violation of accepted police practices, in order to elicit an unreliable confession from him, which they then used as the basis on which to arrest and charge him and his siblings with murder";

- "The purpose of an investigation is to determine the truth about what happened. Instead of attempting to determine the truth through the use of time-tested

investigative procedures which also provide safeguards to prevent citizens from being wrongfully accused, [Defendants] determined that a crime [murder of Marcus Golike] had been committed and that William and some of his siblings [were] involved in the commission of that crime";

- "What began as an ill-conceived cooperative effort by a group of detectives to get a murder conviction for which there was no independent evidence other than that created by the involved detectives – and for which there may very well have been no murder – has continued as an apparent obsession by EPD Detective Vantlin to implicate the members of the Hurt family without concern for the ethical and procedural considerations required by the rule of law. Although many of Detective Vantlin's actions appear to violate EPD written policy, the practices which he has engaged in appear to be tolerated and endorsed by the Evansville Police Department";

- "No reasonably trained, competent law enforcement officer should document only those pieces of information that he deems 'important' to the case, as Detective Vantlin did. That practice blatantly violates generally accepted police practices and procedures";

- "Detective Vantlin's practice of failing to document evidence he was gathering and actions he was undertaking during a homicide investigation reveals either a deliberate attempt at deception and/or a wholesale lack of supervision"; and

- "A law enforcement chain of command should be engaging in substantive and frequent reviews throughout an investigation, particularly one as serious as a homicide investigation, to ensure its integrity. No such review occurred here, either during the investigation or at any time after, in violation of generally accepted law enforcement practices and procedures."

[Filing No. 286-1 at 7-18.]

> ### 2. *The EPD Defendants' Motion to Exclude*

In their Motion to Exclude, the EPD Defendants[3] argue that Mr. Waller's testimony should be limited to only the opinions contained in his report so, for example, he should be prohibited from testifying that certain Defendants did not meet the standard of care where he states in his report only generally that unspecified "police personnel" and "detectives" failed to do so. [Filing No. 287 at 9-10.] The EPD Defendants also contend that Mr. Waller is not qualified to opine as

---

[3] The KSP Defendants have not moved to exclude the testimony of Mr. Waller.

an expert on interrogation techniques or false confessions because he has no experience or training relating to interrogations or false confessions, and his false confession opinions are not based on sufficient facts or data and are not the product of scientific studies. [Filing No. 287 at 12-14.] They assert that Mr. Waller never states what standards of training and practice are acceptable, or what standards of training and practice he employed to provide his opinion. [Filing No. 287 at 15.] The EDP Defendants also argue that Mr. Waller is not qualified to opine on the cause of death of Mr. Golike. [Filing No. 287 at 16.] Finally, they contend that several of Mr. Waller's opinions are inadmissible legal conclusions (including whether Defendants' actions were reasonable, whether probable cause existed for Plaintiffs' arrests, and whether a widespread practice or custom existed that caused injury to Plaintiffs), that testimony regarding any individual's state of mind is inadmissible, and that any testimony that is unlikely to aid the jury is inadmissible. [Filing No. 287 at 17-21.]

In response, Plaintiffs argue that Mr. Waller is qualified to opine on police practices, including the manner in which Defendants investigated the death of Mr. Golike and how the interrogations of Plaintiffs related to that investigation. [Filing No. 309 at 5-9.] Plaintiffs also argue that Mr. Waller's opinions are based on a proper methodology, and assert that Defendants could have asked Mr. Waller more about his methodology during his deposition, but did not. [Filing No. 309 at 10-11.] They argue that there is no requirement that Mr. Waller identify which specific Defendant he is discussing in his report, and that Defendants could have asked him at his deposition to clarify the statements in his report. [Filing No. 309 at 12-13.] Plaintiffs contend that Mr. Waller does not offer impermissible legal conclusions, and may testify that Defendants' conduct deviated from national police practices standards. [Filing No. 309 at 13.] They argue that Mr. Waller should be able to set forth opinions related to the policies and practices of the

- 17 -

Evansville Police Department, and about how Defendants should have considered cause-of-death evidence, without offering a medical opinion on cause of death. [Filing No. 309 at 15-16.] Finally, Plaintiffs argue that Defendants set forth arguments that really relate to the weight of Mr. Waller's testimony, rather than to its admissibility. [Filing No. 309 at 16-20.]

The EDP Defendants repeat many of their arguments in their reply. [Filing No. 312 at 2-10.]

### a.  Whether Mr. Waller is Qualified

The EDP Defendants argue that Mr. Waller is not qualified to testify as an expert on interrogation techniques or false confessions. Mr. Waller has extensive education and experience in police policy, procedure, and practice. He has a Bachelor of Science in police administration and a Master's of Science in public administration, has received over 3,600 hours of law enforcement training, is one of approximately 100 Certified Legal Investigators in the country, is certified as an Internal Affairs Investigator/Supervisor, and has served in various roles including police officer, field training officer, detective, sergeant, lieutenant, department training officer, and chief. [Filing No. 286-1 at 1-2.] He has also served as the director of a regional police training academy, and has trained hundreds of officers in numerous areas including interviewing and interrogation. [Filing No. 286-1 at 2.] The Court finds Mr. Waller qualified to testify regarding police practices, including practices and standards related to interrogations. *Ott v. City of Milwaukee*, 2015 WL 1219587, *11 (E.D. Wis. 2015) (finding Mr. Waller qualified to testify as a police practices expert); *Avery v. City of Milwaukee*, 2015 WL 247991, *2 (E.D. Wis. 2015) (same). He may also testify regarding the types of interrogation techniques that police officers are trained to use, and whether the techniques used by Defendants fell within those parameters.

Mr. Waller may not testify, however, regarding the science of false confessions and coercive interrogations. *See Harris v. City of Chicago*, 2017 WL 3193585, *4 (N.D. Ill. 2017) (limiting police practices expert's testimony where expert's field "is police practices, not the complex social science of false confessions and coercive interrogations"). As discussed above, Professor Drizin is qualified to testify as an expert in the science of social psychology, and specifically the use of coercion in interrogations. The Court has not been provided sufficient evidence to conclude that Mr. Waller has the knowledge, skill, experience, training, or education to testify regarding the phenomenon of false confessions or the impact of coercive techniques on the interrogation subject. Additionally, because the Court has been provided no evidence of any medical training, Mr. Waller may not testify as an expert regarding Mr. Golike's cause of death.

b. Whether Mr. Waller's Methodology is Scientifically Reliable

The EDP Defendants argue that Mr. Waller has not sufficiently identified the police practices he relies upon to render his testimony, and so his methodology is unreliable. The Court disagrees. Mr. Waller states in his report that he follows the same, or a very similar, methodology in all of the cases he has evaluated, and lists the steps he takes. [Filing No. 286-1 at 2-3.] Within the section of his methodology where he states that he compares the facts of each case with the standards of training and practice, Mr. Waller lists numerous sources for those standards including Supreme Court cases, departmental policies and procedures, applicable statewide police training programs, and model policies, training, and research from various institutions. [Filing No. 286-1 at 2.]

Mr. Waller is not required to specify which of these standards he used to opine regarding Defendants' actions in this case, and the EPD Defendants have not provided any legal authority requiring him to do so. Rather, the Court finds – along with multiple other courts – that Mr. Waller

has sufficiently set forth his methodology, and that it is reliable. *See, e.g.*, *Damiani for Estate of Damiani v. Allen*, 2018 WL 4095080, \*5 (S.D. Ind. 2018) (finding Mr. Waller's methodology, which is the same as the methodology he has set forth in this case, reliable, and stating "he familiarizes himself with the facts, draws conclusions based on his knowledge and experience, and then explains those conclusions"); *Estate of Robinson ex rel. Irwin v. City of Madison, Wisconsin*, 2017 WL 564682, \*10 (W.D. Wis. 2017) ("[Mr.] Waller's police practices opinions are sufficiently reliable"). And again, as discussed above in connection with Professor Drizin, the EPD Defendants may cross-examine Mr. Waller regarding his methodology.

c.  Whether Mr. Waller's Testimony Will Aid the Trier of Fact

The EPD Defendants argue that certain testimony from Mr. Waller will not aid the jury, including: (a) any opinion on the review or failure to review Defendants' actions by the Evansville Police Department and its supervisors; (b) any opinion on the basis for the arrests of Plaintiffs, because the opinions go to whether there was probable cause for the arrests; and (c) any opinion on the policies and Operational Guideline of the Evansville Police Department, because they are not relevant to the issue of the EPD Defendants' liability during the interrogation, investigation, and arrest of each Plaintiff. [Filing No. 287 at 20-21.]

Mr. Waller may not testify regarding the review, or lack of review, of Defendants' actions undertaken by the Evansville Police Department, or the policies or guidelines of the Evansville Police Department. Such testimony might have been relevant to claims against the City of Evansville or the Evansville Police Department, but the Court has granted summary judgment in favor of those entities on all of Plaintiffs' claims against them. Accordingly, this testimony is irrelevant and inadmissible.

As to opinions regarding the basis for Plaintiffs' arrests, "[w]hen an expert offers an opinion relevant to applying a legal standard such as probable cause, the expert's role is limited to describing sound professional standards and identifying departures from them." *Jimenez v. City of Chicago*, 732 F.3d 710, 721 (7th Cir. 2013) (citation and quotation omitted); *see also Abdullahi v. City of Madison*, 423 F.3d 763, 772 (7th Cir. 2005) (expert testimony regarding whether officers deviated from reasonable police practices could be relevant). Mr. Waller may not testify regarding his definition of probable cause or whether he believes Defendants had probable cause to arrest Plaintiffs. That type of testimony constitutes legal opinions. *Good Shepherd Manor Found., Inc.*, 323 F.3d at 564 ("[E]xpert testimony as to legal conclusions that will determine the outcome of the case is inadmissible"); *Client Funding Solutions Corp.*, 943 F.Supp.2d at 863 ("Opinions that amount to legal conclusions do not assist the trier of fact"). He may, however, opine regarding the standards for evaluating whether probable cause exists and whether he believes Defendants followed those standards. *Jimenez*, 732 F.3d at 722 (affirming district court's decision to allow expert to testify regarding "the steps a reasonable police investigator would have taken to solve the…murder, as well as the information that a reasonable police investigator would have taken into account as the investigation progressed," and the "ways in which evidence from other witnesses indicated that [defendants] departed from reasonable investigation methods," but prohibiting expert from "resolv[ing] conflicts in the testimony of different witnesses," or "offer[ing] an opinion regarding whether the police had probable cause to arrest [plaintiff]").

### d. Whether Mr. Waller's Testimony is Inadmissible on Other Grounds

Finally, the EPD Defendants argue that Mr. Waller's testimony is inadmissible because it constitutes legal conclusions or because it constitutes opinions regarding an individual's state of mind. As discussed above, Mr. Waller may not testify regarding legal conclusions such as whether

Defendants had probable cause to arrest Plaintiffs. And while he may testify regarding police standards and practices and opine whether Defendants met those standards and/or implemented those practices, he may not testify regarding whether he believes Defendants' actions were reasonable, unlawful, or unconstitutional, that the confessions were unreliable or involuntary, or that Defendants had an obligation to intervene and halt any misconduct. Additionally, Mr. Waller – like Professor Drizin – may not testify regarding any individual's state of mind.

e. Conclusion

The EDP Defendants' Motion to Exclude Anticipated Testimony of Plaintiffs' Experts, [Filing No. 286], is **GRANTED IN PART** and **DENIED IN PART** as follows:

- Mr. Waller is qualified to testify as an expert in police practices. He is not qualified to testify, and may not testify, on the science of false confessions or the use of coercive techniques (other than the types of techniques police officers are trained to use). Mr. Waller also is not qualified to testify as an expert regarding Mr. Golike's cause of death;

- Mr. Waller's methodology is reliable;

- Mr. Waller's testimony regarding police practices will aid the jury, but he may not testify regarding the definition of probable cause and whether he believes Defendants had probable cause to arrest Plaintiffs. He may testify regarding the standards for determining probable cause and whether he believes Defendants met those standards; and

- Mr. Waller may not set forth any legal conclusions, and may not testify regarding any individual's state of mind.

## C. William Gaut

### 1. Summary of Report

William Gaut has been retained by the KSP Defendants in this case. He was a police officer for the Birmingham, Alabama Police Department from 1968 to 1992, when he retired with the rank of Captain of Detectives. [Filing No. 288-2 at 2.] He has a degree in Criminal Justice from the University of Alabama-Birmingham, a Master's in Public and Private Management from

Birmingham Southern College, and a PhD in Criminal Justice from Northcentral University.

[Filing No. 288-2 at 3.]  Since retiring from the Birmingham Police Department, Mr. Gaut has

been the Administrator/Director at the Jefferson County District Attorney's Special Services

Division in Birmingham, an Adjunct Professor teaching various criminal justice classes at

Jefferson State Community College, and, most recently, a Criminal Justice Consultant.  [Filing

No. 288-2 at 1-2.]

Mr. Gaut has testified as an expert on police investigative practices and the principles of

homicide/suicide investigation.  [Filing No. 288-4 at 2.]  He has investigated hundreds of

homicides and over one thousand questionable deaths during his career, conducting interviews and

interrogations "in accordance with constitutionally required standards, and generally accepted

standards of police practices" in all of those cases.  [Filing No. 288-4 at 2.]  During his career in

law enforcement, Mr. Gaut "was responsible for knowing and regularly applying the law in daily

situations so as not to violate the constitutional rights of those [he] served," and has maintained

his knowledge of these principles through continuing education, graduate coursework, and his

involvement in various organizations.  [Filing No. 288-4 at 3.]  Mr. Gaut is also a Certified Police

Academy Instructor.  [Filing No. 288-4 at 4.]

In his report, Mr. Gaut lists the material and facts upon which he relies, then sets forth the

following opinions:

> KSP Detectives Matthew Wise and Zachery Jones assisted Evansville police
> Detectives in establishing sufficient probable cause for the arrest of family
> members…William Hurt, Deadra Hurt and Andrea Hurt.  The actions of KSP
> detectives Wise and Jones in assisting with conducting interviews and
> interrogations of Hurt family members was in keeping with generally accepted
> practices and procedures of law enforcement investigators.

[Filing No. 288-4 at 8.]  Mr. Gaut then sets forth the bases for his opinions in 21 pages.  [Filing

No. 288-4 at 9-30.]

## 2. *Plaintiffs' Motion to Exclude*

In their motion, Plaintiffs argue that Mr. Gaut is not qualified to testify as an expert on false confessions, that his methodology regarding the rate of false confessions does not meet the standards of *Daubert*, and that his opinion that false confessions are rare is not helpful to the jury. [Filing No. 289 at 3-11.] Plaintiffs also assert that Mr. Gaut is not qualified to testify as an expert regarding Mr. Golike's cause of death. [Filing No. 289 at 11.] Plaintiffs argue that Mr. Gaut may not provide opinions which are legal conclusions, such as that Plaintiffs' claims fail, and that Defendants had probable cause to arrest Plaintiffs, and may not provide his own definitions of legal terms. [Filing No. 289 at 12-17.] Finally, Plaintiffs argue that Mr. Gaut may not opine on whether Plaintiffs' confessions were true or false, or whether certain witnesses are credible. [Filing No. 289 at 17-20.]

The KSP Defendants respond that Mr. Gaut is qualified to testify regarding police practices, and also has specific qualifications related to confessions, including "additional specialized education and training in the areas of general, abnormal, and forensic psychology," and various training in interview and interrogation techniques from different law enforcement agencies. [Filing No. 301 at 5-6.] The KSP Defendants contend that Mr. Gaut's methodology is thorough and reliable, that it is typical for a police practices expert, that Mr. Waller employs a similar methodology, that Mr. Gaut supports his opinions with facts and evidence, that his methodology to determine the rate of false confessions is proper, and that Plaintiffs can address any alleged flaws during cross-examination. [Filing No. 301 at 7-12.] The KSP Defendants argue that Mr. Gaut's opinions will assist the jury, that he is not offering medical opinions about Mr. Golike's cause of death, and that he can testify about probable cause – including the probable cause standard and facts supporting probable cause. [Filing No. 301 at 13-19.] They also argue that Mr.

Gaut can define terms without stating legal conclusions, such as "malice" and "conspiracy," and can testify as to ultimate issues such as whether probable cause existed for Plaintiffs' arrests. [Filing No. 301 at 20-21.]  The KSP Defendants assert that Mr. Gaut can opine that Plaintiffs' confessions were true and uncoerced, and that he does not plan to testify regarding witness credibility.  [Filing No. 301 at 22-25.]

In their reply, Plaintiffs set forth many of the same arguments made in their initial brief. [Filing No. 318.]

### a.  Whether Mr. Gaut is Qualified

Plaintiffs do not challenge Mr. Gaut's qualifications to testify as an expert on police practices, and the Court finds that he is qualified in this area.  Mr. Gaut has significant experience as a police officer and in supervisory roles within a police department.  He has also engaged in extensive training in the area of police interviews and interrogations, and has taught in those areas as well.  His knowledge, skill, experience, training, and education qualify him as an expert on police practices.  *See* Fed. R. Evid. 702; *Tolan v. City of Bellaire*, 2015 WL 12765413, *4 (S.D. Tex. 2015) (finding Mr. Gaut qualified to offer opinions on police practices and training, among other things).  However, like Mr. Waller, Mr. Gaut is not qualified to testify regarding the psychology or science of false confessions or the use of coercive techniques.  *See Harris*, 2017 WL 3193585 at *4.  Additionally, he is not qualified to testify – and does not appear to have plans to testify – regarding Mr. Golike's cause of death.

### b.  Whether Mr. Gaut's Methodology is Scientifically Reliable

Plaintiffs argue that Mr. Gaut's methodology regarding the rate of false confessions does not meet *Daubert* standards.  [Filing No. 289 at 8-10.]  Because the Court finds that Mr. Gaut is not qualified to testify regarding the science of false confessions and the use of coercive

techniques, Plaintiffs' argument is moot. Mr. Gaut will not be testifying regarding the rate of false confessions.

As to Mr. Gaut's methodology regarding police practices, although Plaintiffs do not argue otherwise, the Court finds his methodology reliable. Like Mr. Waller, Mr. Gaut sets forth the facts of the case and the material he relies upon and, applying his experience and training, draws his conclusions. To the extent Plaintiffs find shortcomings with Mr. Gaut's methodology, they can question him accordingly during cross-examination.

### c.  Whether Mr. Gaut's Testimony Will Aid the Trier of Fact

Plaintiffs argue that Mr. Gaut's opinion that false confessions are rare is not helpful to the jury. [Filing No. 289 at 10.] Again, Mr. Gaut is prohibited from offering such testimony, so the Court need not consider Plaintiffs' argument. Plaintiffs do not argue that Mr. Gaut's testimony regarding police practices would not aid the jury, and the Court finds that his testimony – as limited in this Order – will aid the jury. *Florek v. Village of Mundelein, Ill.*, 649 F.3d 594, 602 (7th Cir. 2011) (when "something peculiar about law enforcement (*e.g.*, the tools they use or the circumstances they face) informs the issues to be decided by the finder of fact," expert testimony may be helpful to the jury).

### d.  Whether Mr. Gaut's Testimony Is Inadmissible on Other Grounds

Plaintiffs argue that several of Mr. Gaut's opinions are inadmissible legal conclusions. While Fed. R. Evid. 704(a) provides that "[a]n opinion is not objectionable just because it embraces an ultimate issue," Rules 702 and 704 "prohibit experts from offering opinions about legal issues that will determine the outcome of a case." *Roundy's Inc. v. N.L.R.B.*, 674 F.3d 638, 648 (7th Cir. 2012). Like Mr. Waller, Mr. Gaut is prohibited from testifying regarding legal conclusions such as whether Defendants had probable cause to arrest Plaintiffs. He also may not offer his definition

of probable cause or other legal terms.  These concepts will be defined by the Court in the jury instructions.  Mr. Gaut may testify, however, regarding the reasonable and accepted standards used by police officers for determining whether to make an arrest and whether he believes Defendants' actions were consistent with those standards.  *Hopkins v. City of Huntsville, Ala.*, 2014 WL 5488403, *5 (N.D. Ala. 2014) (prohibiting Mr. Gaut from testifying regarding the ultimate issue of whether defendants had probable cause to take certain actions and whether they used excessive force, but permitting him to testify regarding whether defendants' actions were consistent with "reasonable, typical police practices and procedures"); *Jimenez*, 732 F.3d at 722.  Additionally, Mr. Gaut may not testify that Plaintiffs' claims fail, opine regarding whether Plaintiffs' confessions were true or false, or opine on the credibility of other witnesses.

> e.  <u>Conclusion</u>

Plaintiffs' Motion to Exclude Certain Purported Expert Opinions of William Gaut is **GRANTED IN PART** and **DENIED IN PART** as follows:

- Mr. Gaut is qualified to testify as an expert in police practices.  He is not qualified to testify, and may not testify, on the science of false confessions or the use of coercive techniques (other than the types of techniques police officers are trained to use).  Mr. Gaut also is not qualified to testify as an expert regarding Mr. Golike's cause of death;

- Mr. Gaut's methodology is reliable;

- Mr. Gaut's testimony regarding police practices will aid the jury; and

- Mr. Gaut may not testify regarding the definition of probable cause and whether he believes Defendants had probable cause to arrest Plaintiffs, define other legal terms, testify regarding whether he believes that Plaintiffs' claims fail, testify whether he believes that Plaintiffs' confessions were true or false, or opine on the credibility of other witnesses.  He may testify regarding reasonable and accepted standards for determining when a police officer can make an arrest and whether, in his opinion, Defendants' conduct complied with those standards.

### D. David Shraberg

#### 1. Summary of Reports

David Shraberg was retained by the EPD Defendants and the KSP Defendants to conduct mental health examinations of Plaintiffs. He is a medical doctor who graduated from University of Kentucky with a Bachelor's Degree in chemistry and then from Vanderbilt University School of Medicine. [Filing No. 304-1 at 1.] He completed residencies in psychiatry and neurology at Tulane University School of Medicine. [Filing No. 304-1 at 1.] Dr. Shraberg is board-certified in both psychiatry and neurology and has taught both subjects. [Filing No. 304-1 at 2-3.]

Dr. Shraberg testified during his deposition regarding his methodology for performing medical examinations:

> Well, I generally – it depends on what the question I'm being asked, but I always want to have whatever pertinent information that may be available, review the records, and then as I said, I just essentially address the question being asked, prepare my evaluation based on the questions to be asked, and then obviously evaluate the individual. Generally, I may or may not administer some psychological testing and prepare a report.

[Filing No. 290-1 at 11-12.]

Dr. Shraberg submitted separate reports for Andrea, William, and Deadra. [Filing No. 290-9; Filing No. 290-10; Filing No. 290-11.][4] Dr. Shraberg examined Andrea "to determine if [she] sustained any permanent psychological damage from her arrest, incarceration, and subsequent release during these proceedings." [Filing No. 290-9 at 1.] Dr. Shraberg reviewed Andrea's depositions, her medical records, her interrogations, and records from a social worker, and evaluated Andrea based on his examination of her and various medical/behavioral tests. [Filing

---

[4] Dr. Shraberg's reports are filed under seal, and contain significant medical and psychological information for each Plaintiff. The Court will not discuss specific confidential medical information in this Order, nor need it do so in ruling on Plaintiffs' Motion to Exclude.

No. 290-9 at 1-2.]  In his report, he provides extensive "background history" regarding Andrea, from her childhood up to the date of the examination.  [Filing No. 290-9 at 2-5.]  He discusses Andrea's mental status examination, her cognitive functioning, and a diagnostic formulation, and provides his diagnoses for Andrea.  [Filing No. 290-9 at 5-6.]  Dr. Shraberg concludes that Andrea is "functioning probably at a better level than she has ever in her life," and that he does not believe "she will require any treatment nor has she suffered any permanent irrevocable psychological harm or damage from either her arrest, interrogation, incarceration and subsequent release in the Marcus Golike murder trial."  [Filing No. 290-9 at 6-7.]

In his report regarding William, Dr. Shraberg states that the purpose of his evaluation was to "determine if Mr. Hurt suffers any permanent psychiatric impairments from his arrest and incarceration for approximately nine months in the Vanderburgh County Jail."  [Filing No. 290-10 at 1.]  Dr. Shraberg states that he reviewed William's depositions, medical records, and interrogations, and sets forth background history for William, from his childhood to the date of the examination.  [Filing No. 290-10 at 2-4.]  Dr. Shraberg discusses William's mental status examination, his cognitive functioning, and his diagnostic formulation, sets forth diagnoses, and opines that William "is neither receiving nor requires…any type of treatment for any psychological complications of his arrest, incarceration and subsequent trial.  To some extent, he is exaggerating his apprehensions as well as his 'before and after' personality changes, which are inconsistent with the testing and records."  [Filing No. 290-10 at 5-7.]

As to Deadra, Dr. Shraberg states that he evaluated her "to determine if [she] suffers any permanent psychiatric impairments and/or ongoing pain and suffering associated with her arrest and incarceration following the disappearance of Marcus Golike…."  [Filing No. 290-11 at 1.]  As with Andrea and William, Dr. Shraberg states that he reviewed the relevant depositions, medical

- 29 -

records, and interrogations and sets forth Deadra's background history from her childhood to the date of his examination. [Filing No. 290-11 at 1-4.] Additionally, he sets forth the results of his mental status examination, a summary of Deadra's cognitive functioning, and a diagnostic formulation, and provided his diagnoses. [Filing No. 290-11 at 4-6.] Dr. Shraberg concludes that Deadra "neither suffers from any permanent psychological consequences or damage nor requires any treatment for her allegations regarding her interrogation, arrest, and incarceration associated with the Marcus Golike trial." [Filing No. 290-11 at 6.]

       *2. Plaintiffs' Motion to Exclude*

       In their Motion to Exclude, Plaintiffs argue that Dr. Shraberg's opinions are not relevant to any fact in dispute in this case and must be excluded, because "Plaintiffs do not contend and have never alleged that they have permanent psychiatric impairments flowing from Defendants' conduct. Rather, Plaintiffs contend only that they have experienced emotional distress sufficient to obtain damages in a civil rights lawsuit. Dr. Shraberg does not deny that they have experienced symptoms of emotional distress, so his opinions on other types of injuries not claimed in this case are irrelevant." [Filing No. 291 at 3.] Plaintiffs argue that Dr. Shraberg used the American Medical Association Guides to Evaluation of Permanent Impairment (the "Guide") in evaluating Plaintiffs, but that the Guide is used to determine whether a worker has a permanent occupational impairment and that "Defendants are trying to graft a medical concept – 'permanent psychological impairment' – that is commonly used in workers compensation cases onto the legal concept of emotional damages or intentional infliction of emotional distress." [Filing No. 291 at 3-6.] Plaintiffs assert that, even if Dr. Shraberg's opinions were relevant, they should be excluded because his methodology is unreliable. [Filing No. 291 at 8-13.] Specifically, they contend that Dr. Shraberg conducted interviews before and during the psychological testing, which can result

in invalid test results; that he used the SIMS test, which has a high false positive rate and should

not be used to provide a diagnostic opinion; that he had a third-party (his wife, who acted as a

"scribe") present during the mental status interviews, which is contrary to applicable standards and

practices, and failed to acknowledge her presence in his report; that he administered certain tests

in non-standard conditions; and that his opinions "are based on a mix of diagnostic systems which

are not standard in forensic psychiatry." [Filing No. 291 at 10-13.]

In response, the EPD Defendants note that Plaintiffs do not contest Dr. Shraberg's

qualifications. [Filing No. 302 at 2-3.] They then argue that Plaintiffs have put their mental and

emotional states at issue, that they claim they have "lingering mental issues," and that Dr.

Shraberg's opinions are not limited to "permanent psychiatric impairments." [Filing No. 302 at

3-6.] The EPD Defendants also argue that Dr. Shraberg's methodology is reliable, and that he

employed a "standard" methodology of an independent medical examination, psychological

testing, medical record review, and review of records pertaining to the investigation and related

interrogations. [Filing No. 302 at 7.] The EPD Defendants assert that there is no evidence that

the order of interviews and psychological testing created invalid test results, that Plaintiffs'

expert's testimony that the SIMS test has a high rate of false positives and that the use of other

tests is non-standard is not reliable, and that Dr. Shraberg's use of his wife during the examinations

was valid because she is a registered nurse. [Filing No. 302 at 6-15.]

In their response to Plaintiffs' Motion to Exclude, the KSP Defendants set forth many of

the same arguments as the EPD Defendants, argue that Dr. Shraberg uses a similar methodology

to that used by Plaintiff's psychiatric expert, and also address why Dr. Shraberg's opinions would

be helpful to the jury. [Filing No. 305.]

In their reply, Plaintiffs argue that Dr. Shraberg's "opinions do not rebut a single piece of damages testimony in this case. [Dr.] Shraberg does not deny that what Defendants did to Plaintiffs could cause injury. Nor does he deny that each Plaintiff has suffered emotional consequences as a result of the interrogation, incarceration, and defamation by Defendants. His point is that Plaintiffs do not have post-traumatic stress disorder…from this incident which prevents them from functioning in school, work, and relationships. Plaintiffs have never claimed that they have that diagnosis as a result of Defendants' misconduct." [Filing No. 314 at 2.] Plaintiffs provide examples of the types of emotional distress they have suffered, and note that Dr. Shraberg acknowledges that emotional distress in his reports and that his opinions do not contradict them. [Filing No. 314 at 13.] Plaintiffs reiterate their arguments regarding Dr. Shraberg's methodology. [Filing No. 314 at 13-17.]

### a. Whether Dr. Shraberg is Qualified

All parties agree that Dr. Shraberg is qualified to testify as an expert witness regarding whether Plaintiffs have suffered permanent psychiatric injury, and the Court agrees. Dr. Shraberg is board-certified in both psychiatry and neurology and has extensive experience in both areas.

### b. Whether Dr. Shraberg's Methodology is Scientifically Reliable

Plaintiffs raise a number of arguments related to Dr. Shraberg's methodology. The Court rejects Plaintiffs' argument that the presence of Dr. Shraberg's wife, Patricia Shraberg, at the examinations makes the examinations unreliable. Patricia Shraberg is a Registered Nurse, and has outlined her role during the examinations in an Affidavit. [Filing No. 300-7.] Moreover, Nurse Shraberg avers that she did not instruct William, Andrea, or Deadra on what their answers should be during the administration of various tests. [Filing No. 300-7 at 1.] There is no basis to conclude that Nurse Shraberg's presence at the examination invalidates the exam results. Additionally, the

Court finds that Dr. Shraberg's use of certain tests, the conditions during testing, the timing of Plaintiffs' interviews, and the diagnostic systems Dr. Shraberg used are all issues that Plaintiffs can address during cross-examination. Defendants have met their burden of showing that Dr. Shraberg's methodology was reliable.

    c.   <u>Whether Dr. Shraberg's Testimony Will Aid the Jury</u>

Plaintiffs' primary argument is that Dr. Shraberg's testimony is irrelevant, and so will not aid the jury. The Court agrees with Plaintiffs that there is a distinction between emotional distress and the type of permanent psychiatric damage that Dr. Shraberg opines Plaintiffs do not have. It is significant that Dr. Shraberg uses the Guide, which is generally utilized as part of the analysis to determine whether an individual suffers from a permanent mental impairment such that they cannot work and may be entitled to disability. Here, Plaintiffs do not claim that type of permanent mental impairment. While they may claim to still be suffering from some emotional distress, they represent that they do not claim they are suffering from the type of permanent impairments which Dr. Shraberg concludes are absent. And while Dr. Shraberg does mention other types of emotional damages in his reports, he does so in the context of acknowledging that they exist. [*See, e.g.*, Filing No. 290-9 at 6 (Dr. Shraberg stating that "certainly the period from [Andrea's] arrest to the time that she was released from the Vanderburgh County Jail was painful for her…"); Filing No. 290-10 at 2-3 (Dr. Shraberg acknowledging that William "still continues to have some nightmares about 'the interrogation,' and states that at times it was 'scary' when he was in a two-man cell," and that "he worried about his family the whole time he was in jail…"); Filing No. 290-11 at 2 (Dr. Shraberg noting that Deadra was identified during her incarceration by other inmates as "the murderer," and "still has some painful memories of the interrogation…").] Plaintiffs are capable of testifying to the emotional distress they claim to have suffered, just as they described it to Dr.

Shraberg and he outlined it in his report. *Sullivan v. Alcatel-Lucent USA Inc.*, 2014 WL 3558690, *6 (N.D. Ill. 2014) ("Expert testimony does not assist the trier of fact when the jury is able to evaluate the same evidence and is capable of drawing its own conclusions without the introduction of a proffered expert's testimony") (citation and quotation omitted).

It is difficult to determine the relevancy of Dr. Shraberg's testimony without seeing what evidence and arguments Plaintiffs will present at trial. But, if Plaintiffs are true to their word and do not present evidence or argument that they are suffering from permanent psychiatric damage, then Dr. Shraberg's testimony will be excluded as irrelevant. The Court will make a final determination regarding relevancy at the close of Plaintiff's case.

The Court notes, however, that certain aspects of Dr. Shraberg's testimony are irrelevant in any event. Dr. Shraberg's reports contain personal and specific information regarding certain aspects of Plaintiffs' lives that the Court finds irrelevant to the issues in this case. For example, Dr. Shraberg discusses some of the Plaintiffs' current physical health, their views on premarital sex, and whether they go to church. [Filing No. 290-9 at 5; Filing No. 290-11 at 3.] These areas are wholly unrelated to the issues in this case, and such testimony is irrelevant.

Further, Dr. Shraberg provides extensive information in his reports regarding Plaintiffs' early childhoods, their history with the Hurt family, and emotional issues they may have suffered before their interrogations and arrests. The Court finds this information irrelevant to the issue of whether Plaintiffs suffered emotional distress due to Defendants' actions, and Defendants may not use the information to argue that Plaintiffs' damages in this case are mitigated because they were already suffering emotional distress before their interrogations and arrests. *See Cobige v. City of Chicago, Ill.*, 651 F.3d 780, 782 (7th Cir. 2011) ("A tortfeasor takes his victim as he finds him, and if a special vulnerability…leads to an unusually large loss, the wrongdoer is fully liable"); 2

Dan B. Dobbs, *The Law of Torts*, § 313 at 852 (2001) ("If the defendant's conduct would subject him to liability for severe distress to a normal person, he is also liable for damages to an especially sensitive person, even if those damages are much greater because of the special sensitivity. This rule is merely the familiar thin skull or eggshell skull rule as applied to emotional harm"). Additionally, much of this information is inadmissible under Fed. R. Evid. 611(a)(3) ("The court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to…protect witnesses from harassment or undue embarrassment").

d.  Conclusion

The Court **GRANTS IN PART** and **DENIES IN PART** Plaintiffs' Motion to Exclude the Purported Expert Opinions of David Shraberg as follows:

- Dr. Shraberg is qualified as an expert in identifying permanent psychiatric impairments;

- Dr. Shraberg's methodology is scientifically reliable;

- If Plaintiffs do not present evidence or argument at trial that they suffer permanent psychiatric impairments, then Dr. Shraberg's testimony is irrelevant, will not aid the jury, and is inadmissible. The Court will reserve a ruling on relevancy until the close of Plaintiffs' case at trial; and

- In any event, certain testimony regarding aspect of Plaintiffs' lives and their mental condition before their interrogations and arrests are irrelevant and inadmissible.

**III.**
**CONCLUSION**

For the foregoing reasons, the Court:

- **GRANTS IN PART** and **DENIES IN PART** as set forth above the KSP Defendants' Motion to Exclude Plaintiffs' Expert Steven Drizin, [284];

- **GRANTS IN PART** and **DENIES IN PART** as set forth above the EPD Defendants' Motion to Exclude Anticipated Testimony of Plaintiffs' Experts, [286];

- **GRANTS IN PART** and **DENIES IN PART** as set forth above Plaintiffs' Motion to Exclude Certain Purported Expert Opinions of William Gaut, [289]; and

- **GRANTS IN PART** and **DENIES IN PART** as set forth above Plaintiffs' Motion to Exclude the Purported Expert Opinions of Davis Shraberg, [291].

The Court instructs counsel to familiarize their expert witnesses with the permissible parameters of their testimony, as set forth in this Order. At trial, the Court will keep a tight rein on expert witness testimony, and will not allow expert witnesses to serve as mouthpieces for their counsel and to advance argument rather than admissible opinions.

Date: 9/26/2019

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**